UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                :

ENZO BIOCHEM, INC.,                   :
                                                :

               *Plaintiff*,        :
                                                :

       *-against-*            :
                                                :       20-cv-9992 (PAC)

HARBERT DISCOVERY FUND, LP,     :
HARBERT DISCOVERY CO-           :
INVESTMENT FUND I, LP, HARBERT   :       **OPINION & ORDER**
FUND ADVISORS, INC., HARBERT    :
MANAGEMENT CORP., and KENAN    :
LUCAS,                             :
                                                :

           *Defendants.*      :
                                              :
---------------------------------------------------------X

Plaintiff Enzo Biochem, Inc. ("Enzo" or "Company") brings this action pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder against Defendants Harbert Discovery Fund, LP, Harbert Discovery Co-Investment Fund I, LP, Harbert Fund Advisors, Inc., Harbert Management Corp., and Kenan Lucas (collectively "Harbert"). The Complaint alleges that, between 2019 and 2020, Harbert promulgated materially false and misleading proxy solicitations in order to elect two of its nominees to the Company's board of directors.

Harbert moves to dismiss this case pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, raising both procedural and substantive arguments in support of its motion. For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

### I.      Harbert's Introduction to Enzo

The following factual account is drawn from the Complaint and assumed to be true for purposes of resolving this motion.  Plaintiff Enzo is a publicly listed life sciences and biotechnology company that is incorporated and headquartered in New York.  (Compl. ¶¶ 1, 11, ECF 2.)  Enzo was founded in 1976, and today, it operates through three business divisions: Clinical Laboratory, Life Sciences, and Therapeutics.  (*Id.* ¶¶ 17–18.)  The core of Enzo's business consists of developing and manufacturing advanced biotechnology solutions and platforms—for example, COVID testing kits and medical treatments for gastrointestinal diseases—and bringing those products and treatments to market.  (*Id.*)

Defendant Harbert is comprised of a consortium of affiliated investment funds and their portfolio manager, Kenan Lucas.  (*Id.* ¶¶ 11–16.)  Harbert conducts its financial activities from its headquarters in Birmingham, Alabama.  (*Id.*)  It invests in various portfolio companies using an activist investment strategy.  (*Id.* ¶ 20.)  Under that strategy, Harbert "targets illiquid small or micro-cap companies for investment, and attempts to install its appointees on the boards of those companies" in order to effectuate management strategies that are in its interests.  (*Id.*)

Beginning in 2018, Harbert expressed an interest in investing in Enzo and, to that end, met with Company management on several occasions to discuss its "history, strategy, and financial performance."  (*Id.* ¶ 22.)  Until that point, Harbert had no experience investing in the life sciences and biotechnology industries.  (*Id.* ¶ 21.)  Yet, following these interactions, Harbert began investing in Enzo and by 2019, it emerged as Enzo's largest shareholder, having bought up nearly 12% of the Company's shares.  (*Id.* ¶ 23.)

II.   **The Proxy Contest**

On May 28, 2019, Harbert began to seek corporate governance reform within the Company.  (*Id.* ¶ 24.)  In particular, Harbert made the following three corporate governance demands: (1) that Enzo replace two of its incumbent directors with nominees selected by Harbert, (2) that Enzo declassify its board of directors ("Board"), and (3) that it install Kenan Lucas in a "Board observer role."  (*Id.*)

The central dispute in this case stems from the first of these demands.  In 2019, at the time Harbert's demands were made, two of the five seats on the Board were occupied by Barry Weiner and Bruce Hanna.[1]  (Compl. ¶¶ 24–26.)  Directors Weiner and Hanna, however, were up for reelection at the 2019 Annual Meeting of Shareholders ("2019 Meeting"), which was scheduled for January 31, 2020.  (*Id.*)  At the 2019 Meeting, Harbert sought to fill these two seats with its own nominees.  (*Id.*)

But Harbert's private negotiations with the Company regarding its corporate governance demands proved unsuccessful.  (*Id.* ¶ 27.)  So, in September 2019, Harbert launched a proxy contest against the Company to fill the two Board seats at the upcoming 2019 Meeting.  (*Id.*) Through the proxy contest, Harbert sought to replace Weiner and Hanna with nominees Fabian Blank and Peter J. Clemens IV (collectively "Harbert Directors").[2]  (*Id.*)  And to accomplish this

---

[1] Weiner is a co-founder of the Company and has served as its President since 1996.  (Compl. ¶ 25.)  Hanna, a Doctor of Microbiology, was first elected to the Board in January 2017.  (*Id.* ¶ 26.)

[2] Before their election to the Board, Blank had held executive management roles in various health care companies while Clemens had held similar executive management roles in the financial services industry.  *See* 2019 Press Release, at 7–8.

objective, Harbert promulgated the following three proxy solicitations to Enzo's shareholders. (*Id.*)

*First*, in its initial September 17, 2019 Press Release ("2019 Press Release") announcing the proxy contest, Harbert stated that the Harbert Directors: (1) were eminently qualified and "independent candidates," (2) that they had been selected following "an extensive search," (3) that the Harbert Directors had "already studied" the Company's challenges, and (4) that they could immediately help improve the Company's business prospects. (Compl. Ex. A ("2019 Press Release"), ECF 2.)

*Second*, on December 9, 2019, Harbert promulgated a public letter to Enzo's shareholders ("2019 Shareholder Letter") which reiterated the statements made in the 2019 Press Release. (Compl. Ex. B ("2019 Shareholder Letter"), ECF 2.) The 2019 Shareholder Letter, for example, stated that the Harbert Directors were "independent candidates" whose "vast expertise and extensive networks" would substantially benefit Enzo and its shareholders. (*Id.*)

*Finally*, in January 2020, Harbert released a lengthy public presentation ("2020 Presentation") that set forth its case for corporate governance reform (Compl. Ex. C ("2020 Presentation"), ECF 2) and shortly thereafter, circulated a letter to Enzo's shareholders ("2020 Shareholder Letter") echoing similar statements that had already been made in prior proxy solicitations. (Compl. Ex. D ("2020 Shareholder Letter"), ECF 2.) As relevant here, the 2020 Presentation and 2020 Shareholder Letter repeated the lofty representations about the Harbert Directors' qualifications to serve on the Board.

Following these proxy solicitations, in January 2020, three proxy advisory firms—Egan-Jones Proxy Services, Institutional Shareholder Services Inc., and Glass, Lewis & Co.—endorsed the Harbert Directors' candidacies for the Board. (Compl. ¶¶ 36–37.)

### III.      **The Harbert Directors' Election**

On January 28, 2020, three days prior to the 2019 Meeting, Enzo issued a press release announcing that it would delay the 2019 Meeting from January 31 to February 25.  (*Id.* ¶ 38.) In that same press release, Enzo proposed to its shareholders that they: (1) vote to elect the Harbert Directors, (2) expand the size of the Board, and (3) fill the additional Board seats with Weiner and another independent director.  (*Id.*)  In response to this Eleventh Hour adjournment, Harbert filed an action against Enzo in the Southern District of New York on February 5, 2020, claiming violations of Section 14(a) of the Exchange Act and breach of fiduciary duties.  (*Id.* ¶ 41.)

As it turned out, though, the 2019 Meeting went ahead as scheduled on February 25.  (*Id.* ¶ 42.)  There, Enzo's shareholders voted to elect the Harbert Directors to the Board and rejected the Company's proposal to increase the Board's size.  (*Id.*)  Five months later, on July 17, 2020, Harbert voluntarily dismissed its lawsuit against the Company.  (*Id.* ¶ 3.)

### IV.      **The Harbert Directors' Short-Lived Tenure**

Upon their election to the Board, the Harbert Directors requested internal documents and information from Enzo, citing their need: (1) "to educate ourselves on the company and the industry in order to live up to our fiduciary duties," (2) to "start to form a baseline of Enzo," and (3) to "gain a basic understanding of what we are doing."  (*Id.* ¶ 45.)  The Company's management did not respond favorably to these incremental steps.  (*Id.* ¶ 46, 50–51.)

Separately, the Board also took issue with the Harbert Directors' purported communications with Harbert on various occasions about Enzo's internal affairs.  (*Id.* ¶¶ 54–62.) According to the Complaint, the Harbert Directors purportedly communicated with Harbert about the pending Section 14(a) lawsuit that had been previously filed by Harbert against the

Company.  (*Id.* ¶ 55.)  When confronted about these contacts by the Board, the Harbert Directors agreed to disclose their communications with Harbert on the condition that they be indemnified from liability and reimbursed for any legal fees incurred in connection therewith.  (*Id.* ¶¶ 63–78.) The Board rejected those requests.  (*Id.* ¶ 70.)

In the end, the Harbert Directors' tenure on the Board proved unremarkable and short-lived.  On November 9, 2020, Clemens announced his resignation from the Board, and on November 10, Blank followed suit.  (*Id.* ¶ 77.)  In response to these developments, on November 18, 2020, Harbert sent a public letter to the Board calling for the resignation of Enzo's Chairman and CEO, Elazar Rabbani.  (Dell Decl. Ex. 1 ("Harbert November 2020 Letter"), ECF 31.)  The letter asserted that the Harbert Directors were forced to resign given the "extremely hostile environment" that Rabbani had cultivated in opposition to the Harbert Directors.  (*Id.*)  The letter also urged the Board to "immediately pursue" a sale of the Company.  (*Id.*)

**V.      Enzo's Lawsuit**

Enzo filed this lawsuit on November 27, 2020, claiming that Harbert's proxy solicitations with respect to the Harbert Directors were materially false and misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

The Complaint requests several forms of relief, including: (1) an injunction preventing Harbert from prospectively violating Section 14(a) and Rule 14a-9; (2) an injunction requiring Harbert to promulgate corrective disclosures for past proxy solicitations; (3) monetary damages in the form of expenses incurred by Enzo in waging the proxy contest against Harbert; and (4) attorneys' fees and costs of this action.  Harbert now moves to dismiss this case pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

### I.       Rule 12(b)(1)

On a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure,

the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject

matter jurisdiction exists.  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.

1994).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v.

United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In deciding a Rule 12(b)(1) motion, the district

court "may refer to evidence outside the pleadings."  *Id.*  It is incumbent, however, on the

plaintiff to prove subject matter jurisdiction exists by a "preponderance of the evidence"

standard.  *Id.*; *see also Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996).

### II.      Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)) (cleaned up).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."  *Id.*

When considering a Rule 12(b)(6) motion, the district court accepts as true all of the

factual allegations contained in the complaint and draws all reasonable inferences in the

plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  That

rule, however, "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  Accordingly, a

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I.     Jurisdictional Arguments

At the outset, Harbert raises two jurisdictional arguments in support of dismissal under Rule 12(b)(1).  *First*, Harbert contends that the Complaint's request for injunctive relief is moot because it no longer has any intention to nominate additional directors to the Board in the imminent future.  (Harbert Br. at 10–11, ECF 29.)  Additionally, Harbert also argues that Enzo's request for corrective disclosures with respect to past proxy solicitations would have no practical remedial effect given that the proxy contest has long ended and the Harbert Directors have already resigned from the Board.  (*Id.* at 11.)

*Second*, Harbert contends that Enzo lacks Article III standing to sue for monetary damages under Section 14(a) and Rule 14a-9.  (*Id.* at 11–13.)  While recognizing the settled rule that a shareholder has a private right of action for monetary damages under Section 14(a), *see J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), Harbert asserts that this implied right of action does not extend to issuers like Enzo.  (*Id.* at 11–13.)  For the following reasons, neither jurisdictional argument is persuasive.

***Mootness.***  Under Article III of the Constitution, this Court cannot "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  But whether a matter is moot, for Article III purposes, is a fact intensive question tailored to the nature and circumstances of each case.  *See Garcia v. Four Bhd. Pizza, Inc.*, No. 13 CV 1505 VB, 2014 WL

2211958, at *3 (S.D.N.Y. May 23, 2014).  Thus, in accommodating the practical concerns of addressing jurisdictional issues like mootness, the Second Circuit has explained that district courts enjoy "leeway as to the procedure it wishes to follow."  *All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006).  And "where the mootness issue is inextricably intertwined with the merits, deferral of the jurisdictional issues until the summary judgment stage is appropriate."  *Horsehead Res. Dev. Co. v. B.U.S. Env't Servs., Inc.*, 928 F. Supp. 287, 290 (S.D.N.Y. 1996) (cleaned up).

The Court finds that deferral on the mootness issue is appropriate here.  *See Horsehead*, 928 F. Supp. at 290.  As noted at the outset, Harbert maintains that Enzo's injunctive relief claims are moot because (1) it currently has no intention to nominate additional directors to the Board and (2) because any corrective disclosures—applied retroactively—would serve no practical remedial purpose.  *See supra* 7–8.  Each of these mootness arguments, however, calls for the resolution of delicate factual determinations that closely track the merits of this Section 14(a) lawsuit.  *See Horsehead*, 928 F. Supp. at 290; *see also Pyramid Crossgates*, 436 F.3d at 88.

The arguments implicate, for example, the past behavior of Harbert as an investor in the Company and whether that conduct raises the inference that it is likely to renominate directors to the Board in the future.  *See Horsehead*, 928 F. Supp. at 290.  Indeed, given that Harbert still has a substantial ownership stake in the Company, Enzo's interest in obtaining prospective injunctive relief appears to be—at the very least—a plausible one that is worthy of careful consideration in light of the relevant facts.  *See id.*  Moreover, with respect to the corrective disclosures point, factual discovery of the Company's alleged injuries (caused by the underlying proxy contest) would help delineate the contours of the requested injunction's remedial effect.  *See id.* Accordingly, the Court concludes that these circumstances warrant deferral on the mootness

issue until there is an "ample opportunity to secure and present evidence relevant to the existence of jurisdiction."[3]  *Garcia*, 2014 WL 2211958, at *3.

*Enzo's Article III Standing.*   Turning to the next jurisdictional challenge, Harbert contends that Enzo lacks Article III standing to sue for money damages under Section 14(a) and Rule 14a-9.  In contrast to the mootness analysis, Harbert's Article III standing argument cannot be deferred as it presents a pure issue of law not contingent upon the discovery of any additional facts.

That pure issue of law is whether an issuer has an implied right of action to sue for money damages under Section 14(a) of the Exchange Act.  In 1964, the Supreme Court held in *Borak* that a shareholder has an implied right of action to bring suit, either in a direct or derivative capacity, under Section 14(a) of the Exchange Act.  377 U.S. at 431.  Two years later, in *Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966), Judge Friendly extended this implied right of action to an issuer suing for injunctive relief under Section 14(a).  *Id.* at 694–95; *see GAF Corp. v. Milstein*, 453 F.2d 709, 719 (2d Cir. 1971) ("We have already held that an issuer has standing to assert violation of section 14(a), governing proxy contests[.]").  *Studebaker*,

---

[3] Indeed, the parties' briefing demonstrates why deferral is the appropriate way of proceeding here.  In their briefs, both parties cite to and rely on extraneous documents and information (not referred to in the Complaint) in support of their respective mootness positions.  This reliance on extraneous factual materials therefore illustrates why discovery would aid in the resolution of the mootness issue.

however, did not expressly address the question raised here: whether an issuer could sue for *monetary* damages under Section 14(a).[4]

At first blush, it is not at all obvious why *Studebaker*'s reasoning would not apply with equal force to an issuer seeking monetary damages for violations of Section 14(a).  After all, in extending the implied right of action under Section 14(a) to issuers, *Studebaker* relied on the reasoning of *Borak*, which had implied both injunctive and monetary causes of action under Section 14(a) based on the Exchange Act's broad remedial purposes.  *See Studebaker*, 360 F.2d at 694–95.  But still, Harbert contends that subsequent developments in the Supreme Court's implied rights of action jurisprudence support the conclusion that an issuer does not have Article III standing to sue for monetary damages under Section 14(a).  (Harbert Br. at 11–13.)  And more specifically, it argues that the Court's decision in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), sheds doubt on *Borak*'s and *Studebaker*'s continued vitality.

In *Virginia Bankshares*, the Supreme Court "acknowledged that its implied private right of action jurisprudence for § 14(a), beginning with *Borak* in 1964, predates the Court's more recent focus on congressional intent and is not entirely consistent with that focus."  *Koppel v. 4987 Corp.*, 167 F.3d 125, 135 (2d Cir. 1999) (discussing *Virginia Bankshares*, 501 U.S. at 1102–05).  As the Second Circuit explained in *Koppel*, however, *Virginia Bankshares* did not (as Harbert contends) abrogate "*Borak* and its progeny[.]"  *Id.*  Instead, it "endorsed a modified

---

[4] This Article III standing issue has led to a split in authorities, with some courts declining to recognize an issuer's Article III standing to sue for money damages under Section 14(a), *see, e.g.*, *Tenet Healthcare Corp. v. Cmty. Health Sys., Inc.*, 839 F. Supp. 2d 869, 871 (N.D. Tex. 2012); *Diceon Elecs., Inc. v. Calvary Partners, L.P.*, 772 F. Supp. 859 (D. Del. 1991), and other courts reaching the opposite conclusion, *see, e.g.*, *CNW Corp. v. Japonica Partners, L.P.*, 776 F. Supp. 864, 869 (D. Del. 1990); *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 899 (S.D.N.Y. 1984).

approach to implied private rights of action under § 14(a)," which asks whether the implied right

of action at issue:

> [C]omports generally with the congressional intent identified in *Borak*, falls
> within the contours of similar private rights of action granted by the Supreme
> Court and other Circuits, and does not raise the policy concerns that motivated the
> Court to decline to extend a private right of action in *Virginia Bankshares*.

*Id.*

Applying this standard, the Court holds that an issuer has Article III standing to sue for

monetary damages under Section 14(a) for alleged violations of Rule 14a-9.  *See, e.g.*, *CNW*

*Corp. v. Japonica Partners, L.P.*, 776 F. Supp. 864, 869 (D. Del. 1990); *Pantry Pride, Inc. v.*

*Rooney*, 598 F. Supp. 891, 899 (S.D.N.Y. 1984).

*First*, recognizing an issuer's right of action for money damages under Section 14(a)

would comport with the congressional intent identified in *Borak* of protecting "fair corporate

suffrage" and "the voting rights of shareholders."  *Koppel*, 167 F.3d at 135–36.  In fact, an

issuer, as opposed to individual shareholders, would typically be better situated in terms of

resources and corporate influence to pursue litigation under Section 14(a) and as a result, enforce

the "fair corporate suffrage" policies undergirding the statute.  *Id.*; *see generally* Sean J. Griffith*,*

*Correcting Corporate Benefit: How to Fix Shareholder Litigation by Shifting the Doctrine on*

*Fees*, 56 B.C. L. Rev. 1 (2015) (discussing the problems and limitations of shareholder

litigation).  Accordingly, the first *Koppel* factor weighs in favor of Enzo's Article III standing.

*Second*, conferring this implied right of action would also fit comfortably "within the

contours of similar rights of action granted by the Supreme Court and other Circuits."  *Id.*

(cleaned up); *see Virginia Bankshares*, 501 U.S. at 1104–05.  As discussed before, the Supreme

Court in *Borak* implied a right of action for a shareholder to sue under Section 14(a), 377 U.S. at

431, and the Second Circuit in *Studebaker* extended that right to an issuer suing for injunctive

relief under Section 14(a), 360 F.2d at 694.  In light of the "contours" sketched by these precedents, it would make little sense to now suggest that the implication of a right of action for monetary damages, under Section 14(a), should be frozen at injunctive relief with respect to issuers.[5]  *Koppel*, 167 F.3d at 135–36; *see Virginia Bankshares*, 501 U.S. 1104–05.  Hence, this factor also weighs in favor of standing.

*Finally*, the policy concerns that led the Court in *Virginia Bankshares* to "halt the growth of the private right under Rule 14a-9" would not arise by permitting an issuer to sue for monetary damages.  *Koppel*, 167 F.3d at 137.  In *Virginia Bankshares*, the Court held that a group of minority shareholders of a corporation—whose votes were not required by law or corporate regulations to authorize the corporate transaction at issue—did not have an implied right of action to bring suit under Section 14(a).  501 U.S. at 1106.  And in reaching that conclusion, the Court rested its rationale partly on practical considerations, including the fact that such lawsuits would raise "hazy" and "unreliable" issues in regards to causation during the course of litigation.  *Id.*

Here, however, none of those policy concerns apply.  On the contrary, a suit for money damages brought by an issuer under Section 14(a) would proceed just like any other *Borak* action—except of course that the plaintiff would be an issuer and not a shareholder.  *Koppel*, 167 F.3d at 137.  In other words, the "threats of speculative claims and procedural intractability"

---

[5] Denying a corporation an implied right of action to sue for money damages, under Section 14(a), would also belie the logic of shareholder derivative suits brought under *Borak*.  Under *Borak*, a shareholder has an implied right of action to sue for monetary or injunctive relief under Section 14(a) either in a derivative or personal capacity.  Assuming a *Borak* plaintiff were to bring a derivative lawsuit and the corporation were to then accept the plaintiff's litigation demand (if one is made), the factual scenario there would be precisely what is at issue here: a corporation suing for money damages under Section 14(a).  The logic behind derivative lawsuits, then, also suggests that an issuer be permitted to sue for money damages under Section 14(a).

identified in *Virginia Bankshares* would not arise by permitting Enzo to proceed with its monetary damages claim.  501 U.S. at 1105.  Accordingly, policy considerations also weigh in favor of implying a right of action.[6]

In sum, the Court concludes that Enzo has Article III standing to bring its claim for money damages under Section 14(a) and Rule 14a-9.

## II.   <u>Heightened Pleading Standards</u>

Before turning to the merits of the Company's Section 14(a) claim, the Court must first determine whether the heightened pleading standards set forth in the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure apply in the instant case.  The Court will discuss each pleading rule in turn.

*PSLRA's Heightened Pleading Standard.*  Under the PSLRA, a plaintiff who alleges that a defendant "made an untrue statement of a material fact" must satisfy the following heightened pleading standard:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

---

[6] Aside from its misguided reliance on *Virginia Bankshares*, Harbert relies on *Diceon*, 772 F. Supp. at 859, for the proposition that an issuer does not have standing to sue for money damages under Section 14(a).  *Id.* at 870 (declining to extend a right of action for money damages under Section 14(a) to a corporation).  But *Diceon* is distinguishable because its reasoning was largely predicated upon its understanding of Third Circuit precedent—which it read to have "implicitly rejected" the rule that an issuer has standing to bring suit under Section 14(a).  772 F. Supp. at 868.  That, of course, is not the case in this circuit where *Studebaker* remains good law.  Hence, Harbert's reliance on *Diceon* is unpersuasive.

Here, all agree that this provision applies to lawsuits brought under Section 14(a) and Rule 14a-9. *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012) (applying § 78u-4(b)(1) to Section 14(a) lawsuit). Where the parties disagree, however, is whether the PSLRA's heightened pleading standard for state of mind, 15 U.S.C. § 78u-4(b)(2), also applies to Section 14(a) lawsuits. That provision states:

> [I]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

Although the Second Circuit has yet to answer this question, after careful consideration of the relevant case law, the Court holds that Section 78u-4(b)(2) does not apply to suits brought under Section 14(a).

It is well established in this circuit that scienter is not a required element of a Section 14(a) claim. *See Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive."). Therefore, a plaintiff can state a viable claim under Section 14(a) by merely pleading negligence. *Id.*; *see Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). "Because a Section 14(a) claim can be stated under a theory of negligence, the applicability of [Section 78u-4(b)(2)] depends on whether negligence is a "state of mind." *Bricklayers*, 866 F. Supp. 2d at 240.

As Judge Posner explained in *Beck*, however, "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below

average in his ability to exercise due care), to come up to the specified standard of care." 559

F.3d at 682; *see Bricklayers*, 866 F. Supp. 2d at 240.  And on that view, Judge Posner concluded

that Section 78u-4(b)(2), which applies only where a plaintiff must demonstrate "a particular

state of mind," could not apply to Section 14(a) cases.  559 F.3d at 682.  The Court finds Judge

Posner's reasoning persuasive.  *See, e.g.*, *Bricklayers*, 866 F. Supp. 2d at 240 ("The Court finds

the reasoning in Beck more persuasive and concludes that § 78 u-4(b)(2) is inapplicable to

Plaintiff's claims.").  Accordingly, Section 78u-4(b)(2) of the PSLRA is inapplicable to the

instant action.[7]

***Rule 9(b)'s Heightened Pleading Standard***.  Next, Rule 9(b) of the Federal Rules of

Civil Procedure also calls for a heightened pleading standard for allegations that sound in fraud.

Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake[.]").  To satisfy Rule 9(b), the Second Circuit has

explained that a complaint must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.

2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Although, as explained previously, liability under Section 14(a) can be premised on mere

negligence as opposed to fraud, *see Wilson*, 855 F.2d at 995, whether Rule 9(b)'s heightened

pleading standard applies to a particular case turns on the nature of the plaintiff's allegations, not

the elements of the legal cause of action, for which the lawsuit is brought.  *See Police & Fire*

---

[7] While the PSLRA also requires pleading of loss causation, 15 U.S.C. § 78u-(b)(4), this
provision does not merit separate discussion given that loss causation is a substantive element of
a Section 14(a) claim.  *See supra* 16–17.

*Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009).  In other words, if "a plaintiff's factual assertions in a Section 14(a) claim are premised on fraudulent conduct, 'they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory.'"  *Bricklayers*, 866 F. Supp. 2d at 239 (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005)).

Applying that here, the Court holds that Rule 9(b)'s heightened pleading standard is applicable because the Complaint pleads allegations that are anchored in fraud.  *See SafeNet*, 645 F. Supp. 2d at 226.  The gravamen of Enzo's Section 14(a) claim is that Harbert promulgated materially false proxy solicitations in order to "take control of Enzo and force a fire sale[.]" (Compl. ¶ 2.)  In particular, the Complaint alleges that Harbert (1) "concocted a plan (*id.* ¶ 1)," (2) that it "engaged in secret backchannel discussions with the Harbert Directors" (*id.* ¶ 3), and (3) that Harbert "failed to disclose their plan to take control of Enzo and force a fire sale" (*id.* ¶ 2).  The "wording" and "imputations" of these allegations are those "classically associated with fraud."  *Rombach*, 355 F.3d at 172.  The Court therefore concludes that Rule 9(b)'s heightened pleading standard applies to Enzo's Section 14(a) claim.  *Id.*

### III.   <u>Section 14(a) Claim</u>

To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must show that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *SafeNet*, 645 F. Supp. 2d at 226 (quoting *In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 320–21 (S.D.N.Y. 2007)).  Further, for the reasons stated above, Enzo's Section 14(a) claim must be pled

according to the heightened pleading standards set forth in the PSLRA and Rule 9(b). *See supra* 14–17.

According to the Complaint, Harbert promulgated materially false and misleading proxy solicitations to Company shareholders in order to elect the Harbert Directors to the Board. The statements at issue in this lawsuit can be bifurcated into three categories: (1) statements describing the Harbert Directors as independent and conflict-free directors ("Independent Statements"); (2) statements describing the Harbert Directors' sterling qualifications ("Qualification Statements"); and (3) statements regarding the prospective plans and strategies the Harbert Directors would execute upon election to the Board ("Future Plan Statements"). (Compl. ¶¶ 86–89.)

As an initial matter, the Court concludes that Enzo has plausibly pled both loss causation and transaction causation with respect to all three categories of proxy solicitations. *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) ("We have also noted that both loss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a–9 promulgated thereunder."). To plausibly allege loss causation under Section 14(a), a plaintiff must satisfy "Rule 8 notice pleading standards," which requires "some indication of the loss and the causal connection that the plaintiff has in mind." *Bricklayers*, 866 F. Supp. 2d at 245 (cleaned up). And to plausibly allege transaction causation, a plaintiff must show that the proxy solicitations at issue were an "essential link" to the accomplishment of the disputed transaction. *SafeNet*, 645 F. Supp. 2d at 238. The Court finds that the Complaint clears both hurdles here.

*First*, as it relates to loss causation, the Complaint plausibly alleges that Enzo was forced to expend unnecessary Company resources in waging a proxy contest against Harbert. (Compl.

¶¶ 38–41, 83.)  In particular, the Complaint alleges that the proxy contest was illegitimate due to the material misrepresentations of Harbert and that, therefore, Enzo's expenditure of company resources in waging the proxy contest constitute legal damages compensable under Section 14(a).  (*Id.* ¶¶ 22–23.)  These allegations are sufficient to ground a theory of loss causation under Section 14(a) because they plead "some indication of the loss and the causal connection that the plaintiff has in mind."  *Bricklayers*, 866 F. Supp. 2d at 245 (cleaned up).  Hence, the Court finds that loss causation has been plausibly pled.

*Second*, Enzo has also plausibly alleged transaction causation by explaining how the proxy solicitations at issue were an "essential link" to the accomplishment of the wrongful transaction: the Harbert Directors' election to the Board.  *SafeNet*, 645 F. Supp. 2d at 226.  For example, the Complaint alleges that Harbert's proxy solicitations convinced three proxy advisory firms to endorse the Harbert Directors' candidacies (Compl. ¶¶ 36–37); and it also alleges that those solicitations misled the majority of Enzo's shareholders into voting for the Harbert Directors at the 2019 Meeting (*id.* ¶¶ 85, 94–95).  The Court finds that these allegations demonstrate an "essential link" between Harbert's proxy solicitations and the transaction complained about.  *SafeNet*, 645 F. Supp. 2d at 238 ("Actions brought under Section 14(a) . . . should be sustained only when they challenge a transaction which was the subject of the proxy materials, such as approval of a merger agreement or the election of corporate directors.").

Having addressed causation, the remaining issue on this motion is whether the three categories of proxy solicitations—the Independent Statements, Qualification Statements, and Future Plan Statements—sufficiently allege material misrepresentation under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  Reviewing the statements in light of

the heightened pleading standards set forth under the PSLRA and Rule 9(b), *see supra* 14–17, the Court concludes that they do.

### 1.    Independent Statements

For a proxy solicitation to be materially misleading under Section 14(a), there must be "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see Koppel*, 167 F.3d at 131.  This is an inherently "fact-specific inquiry" and, therefore, on a Rule 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the questions of their importance."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (cleaned up); *see Koppel*, 167 F.3d at 131.

As noted above, the Independent Statements consists of statements promulgated by Harbert in the lead up to the 2019 Meeting that describe the Harbert Directors as independent and conflict-free candidates.  Specifically, the Independent Statements describe the Harbert Directors as:

- Candidates who are "independent," and "completely independent of Harbert."  (Compl. ¶¶ 86(a), 87(a), 88(a), 89(a).)

- Candidates who would "truly represent and act in the best interests of all shareholders."  (*Id.* ¶ 88(b).)

According to the Complaint, each of these statements were materially false and misleading under Section 14(a) because the Harbert Directors were not in fact independent of Harbert's influence.  (*Id.* ¶¶ 54–59.)  And to show this, the Complaint pleads the following

allegations: (1) that following their election to the Board, the Harbert Directors were in secret communications with Harbert regarding Enzo's internal management (*id.* ¶¶ 54–57); (2) that the Harbert Directors initially misrepresented to the Board the extent of their contacts with Harbert before agreeing to disclose all their communications on the condition that they be indemnified from liability and reimbursed any legal fees incurred in connection therewith (*id.* ¶¶ 63–67, 69–70); and (3) instances where the Harbert Directors communicated to the Board that they did not wish to take "actions that would harm Harbert's" interests (*id.* ¶¶ 79–82).

Viewing these allegations in the light most favorable to Enzo, the Court finds that these allegations satisfy the heightened pleading standards set forth in the PSLRA and Rule 9(b). As required under those special pleading rules, the Complaint refers to specific statements made by Harbert that were purportedly false and misleading. *See* 15 U.S.C. § 78u-4(b)(1); *Rombach*, 355 F.3d at 170. Moreover, the Independent Statements satisfy the materiality requirement because in considering whether to vote for the Harbert Directors at the 2019 Meeting, a reasonable shareholder would have considered descriptions about the Harbert Directors' independence and pre-existing conflicts to be important in exercising her vote. *See ECA*, 553 F.3d at 197; *Koppel*, 167 F.3d at 131. Therefore, the Court concludes that Enzo has plausibly alleged the first element—material misrepresentation—with respect to the Independent Statements.

Harbert counters by arguing that the Independent Statements were not factually incorrect or misleading given that they were meant to convey that the Harbert Directors "would be independent members of the Board, which had long been dominated by Company insiders." (Harbert Br. at 14) (emphasis omitted). Alternatively, Harbert also contends that the statements were not false or misleading because the Harbert Directors were not in "any business or contractual relationship with Harbert." (*Id.*)

21

The Court finds both arguments unavailing.  *First*, as the Second Circuit explained in *Koppel*, the fact that a proxy solicitation can lend itself to more than one plausible interpretation does not merit dismissal at the Rule 12(b)(6) stage.  *See* 167 F.3d at 133 ("If a trier of fact agreed with the complaints' plausible interpretation of the Solicitation, Associates' misleading reliance on the Consensus Report could constitute a material misrepresentation or omission.").  And here, Enzo's interpretation of the Independent Statements is certainly plausible, given that at least one of the Independent Statements explicitly described the Harbert Directors as being "completely independent of Harbert."  (Compl. ¶ 89(a).)  So Harbert's interpretive contention must be rejected.

*Second*, Harbert's alternative argument that the Harbert Directors were independent of Harbert raises issues of fact that cannot be resolved on this motion.  *See ECA*, 553 F.3d at 197.  While Harbert's account may indeed be true, Enzo has also pled plausible allegations showing that the Harbert Directors acted in accordance with Harbert's interests upon their election to the Board.  Hence, the trier of fact, not this Court, must be tasked with resolving these factual inconsistencies.  *See ECA*, 553 F.3d at 197.

In sum, the Court concludes that the Complaint states a viable claim with respect to the Independent Statements.

### 2.    Qualification Statements

Next, the Complaint alleges that several of Harbert's statements describing the Harbert Directors' sterling qualifications to serve as Board directors were materially misleading under Section 14(a).  The Qualification Statements assert that:

- The Harbert Directors were "highly qualified" and had "already studied Enzo and the challenges it faces."  (Compl. ¶¶ 86(b), 87(b), 88(a).)

- The Harbert Directors "can immediately help improve [Enzo's] expense structure and implement a growth strategy that will generate durable long-term shareholder value." (*Id.* ¶ 86(c).)

- The Harbert Directors had "vast expertise and extensive networks" that would "put Enzo in a position to execute strategic partnerships that can quickly accelerate growth in the life sciences division." (*Id.* ¶¶ 87(c), 88(c).)

- The Harbert Directors would "provide the relevant skillsets and expertise required to help realize Enzo's value potential." (*Id.* ¶ 89(c).)

The Complaint alleges that the Qualification Statements were materially misleading because the Harbert Directors had no expertise in the Company's industry (*id.* ¶ 44) and because they had not already studied the issues confronting the Company prior to their election (*id.* ¶ 43). And to support this theory, the Complaint points to instances in which, following their election to the Board, the Harbert Directors communicated to Enzo's management that they needed to educate themselves on the Company in order to "gain a basic understanding" of the Company (Compl. ¶ 45) as well as their failure to set forth any strategic plan for the Company during their tenure. (*Id.* ¶¶ 51–52.)

Harbert responds that these statements were not technically incorrect in light of the Harbert Directors' prior business experiences and bona fides. (Harbert Br. at 15–16.) But in drawing all reasonable inferences in favor of Enzo, the Court finds that the Complaint plausibly alleges an alternative reading of the Qualification Statements—that is, that the Harbert Directors would be *specifically* qualified to contribute to the Company given their expertise in the

particular industry and their upfront work in studying the Company's pressing issues.  *Koppel*, 167 F.3d at 133.  Harbert's argument is unpersuasive.

Finally, Harbert contends that the Qualification Statements are statements of opinion and therefore that they "do not provide a basis for relief under the federal securities law."  (Harbert Br. at 16.)  The Court disagrees.  Even if the Qualification Statements were statements of opinion, liability could still attach under Section 14(a) if a jury were to find that Harbert failed to accurately state its opinion in the proxy solicitations.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) (explaining that opinions may be actionable under the securities laws because "every such statement explicitly affirms one fact: that the speaker actually holds the stated belief").  *Id.* at 184.  Harbert's resort to an opinion defense is therefore unavailing.

In sum, the Court concludes that Enzo has sufficiently alleged a Section 14(a) claim with respect to the Qualification Statements.

### 3.    Future Plan Statements

Finally, the Complaint alleges that Harbert's statements regarding the Harbert Directors' future plans and strategies for the Company were material misrepresentations under Section 14(a).  The Future Plan Statements stated that the Harbert Directors would:

- "Develop a better strategic plan for the business." (Compl. ¶¶ 86(d), 87(d), 88(d).)

- "Be immediately impactful in addressing the Company's bloated cost structure."  (*Id.*)

- "Deliver on the potential of strategic partnerships to grow the business." (*Id.*)

Harbert's principal argument here is that the Future Plan Statements are not actionable under Section 14(a) because they constitute puffery statements that are immaterial as a matter of law.  (Harbert Br. at 17–18.)

"Puffery is defined as 'an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law.'"  *Bricklayers*, 866 F. Supp. 2d at 243 (quoting *ECA*, 553 F.3d at 206)).  As Chief Judge Swain explained in *Bricklayers*:

> In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution.  As explained above, materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury.  The only circumstances in which a Court may deem a statement immaterial as a matter of law is when it is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

*Id.* (cleaned up).

Applying that reasoning here, the Court finds that it cannot dismiss the Future Plan Statements on the grounds that they constitute puffery.  *See id.*  The Future Plan Statements were not "obviously" so "unimportant" that a reasonable shareholder would not have considered the statements in exercising her vote at the 2019 Meeting.  *See id.*  Even more so where these statements were repeated in multiple proxy solicitations leading up to the 2019 Meeting.  *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.") (cleaned up).  Accordingly, the Court concludes that Enzo has stated a viable Section 14(a) claim with respect to the Future Plan Statements.

IV.   **Material Omission**

Finally, the Complaint also pleads an actionable omission under Section 14(a), which is that Harbert failed to disclose its "plan to take control of the Board and force a fire sale of the Company."  (Compl. ¶ 93.)  Because this allegation fails to state a claim under Section 14(a), it must be dismissed pursuant to Rule 12(b)(6).

The Supreme Court and courts within this district have long recognized that, under the federal securities laws, "the unclean heart of a director is not actionable, whether or not it is disclosed, unless the impurities are translated into actionable deeds or omissions both objective and external."  *Stedman v. Storer*, 308 F. Supp. 881, 887 (S.D.N.Y. 1969) (cleaned up); *see Virginia Bankshares*, 501 U.S. at 1096.  *Virginia Bankshares* in fact explicated this very principle and concluded that "disbelief or undisclosed motivation, standing alone, is insufficient to satisfy the element of fact that must be established under § 14(a)."  501 U.S. at 1096.  In doing so, Justice Souter reasoned:

> [T]o recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize § 14(a) litigation confined solely to what one skeptical court spoke of as the "impurities" of a director's "unclean heart." *Stedman v. Storer*, 308 F.Supp. 881, 887 (SDNY 1969) (dealing with § 10(b)). This, we think, would cross the line that *Blue Chip Stamps* sought to draw. While it is true that the liability, if recognized, would rest on an actual, not hypothetical, psychological fact, the temptation to rest an otherwise nonexistent § 14(a) action on psychological enquiry alone would threaten just the sort of strike suits and attrition by discovery that *Blue Chip Stamps* sought to discourage

*Id.*

The omission alleged to be materially misleading here is precisely the kind that *Virginia Bankshares* explained was unactionable under Section 14(a).  *See id.*  In short, Enzo alleges that Harbert should incur liability under Section 14(a) because it failed to disclose its true motive of initiating the proxy contest.  But whether that undisclosed motive is true or false is of no

importance; under *Virginia Bankshares*, the Court cannot impose liability for such omissions as a matter of law.  *See* 501 U.S. at 1096.  Thus Enzo's claim with respect to the alleged omission must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Harbert's motion to dismiss is **GRANTED** in part and **DENIED** in part.  The Court will convene an in-person conference for Thursday, October 28, 2021 at 10:00 AM in Courtroom 14(c) to discuss next steps.


Dated: New York, New York
     September 27, 2021

SO ORDERED

_____
HONORABLE PAUL A. CROTTY
United States District Judge