**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ENZO BIOCHEM, INC.,<br><br>*Plaintiffs*,<br><br>- against -<br><br>HARBERT DISCOVERY FUND, LP, HARBERT DISCOVERY CO-INVESTMENT FUND I, LP, HARBERT FUND ADVISORS, INC., HARBERT MANAGEMENT CORP., and KENAN LUCAS,<br><br>*Defendants*. | No. 20-cv-9992 (PAC)<br><br>ECF Case |
| HARBERT DISCOVERY FUND, LP and HARBERT DISCOVERY CO-INVESTMENT FUND I, LP,<br><br>*Counterclaim-Plaintiffs,*<br><br>- against -<br><br>ENZO BIOCHEM, INC., ELAZAR RABBANI, BARRY W. WEINER, BRUCE A. HANNA, DOV PERLYSKY, REBECCA FISCHER, MARY TAGLIAFERRI and IAN B. WALTERS,<br><br>*Counterclaim-Defendants.* | |

**ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS OF DEFENDANTS HARBERT DISCOVERY FUND, LP AND HARBERT DISCOVERY CO-INVESTMENT FUND I, LP**

Defendants Harbert Discovery Fund, LP, Harbert Discovery Co-Investment Fund I, LP,

Harbert Fund Advisors, Inc., Harbert Management Corp., and Kenan Lucas (collectively,

"Harbert" or "Defendants") by and through their attorneys, Schulte Roth & Zabel LLP, submit

1

this Answer to the November 27, 2020 Complaint (the "Complaint," Dkt. No. 2) filed by Plaintiff Enzo Biochem, Inc. ("Enzo" or the "Company").

For the avoidance of doubt, Defendants deny each and every allegation contained in the Complaint, except as specifically admitted herein, and any factual assertion admitted herein is admitted only as to the specific facts and not as to any conclusion, characterization, implication, innuendo or speculation contained in any assertion or in the Complaint as a whole. Headings in the Complaint are not allegations and therefore do not require a response.

Defendants answer the numbered Paragraphs 1 through 102 in the Complaint as follows:[1]

1.      Defendants admit the allegations in the first sentence of Paragraph 1 of the Complaint. The second sentence of Paragraph 1 contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 1. Defendants admit the allegations in the third sentence of Paragraph 1 and aver that Enzo Biochem, Inc. is the first portfolio company for which Harbert Discovery Fund has even run a proxy contest. Defendants deny the allegations in the fourth and fifth sentences of Paragraph 1. Defendants deny the allegations in the sixth sentence of Paragraph 1, except admit that Harbert nominated Fabian Blank and Peter J. Clemens (the "HDF Nominees") as candidates for director of the Company. The seventh and eighth sentences of Paragraph 1 purport to quote from a September 17, 2019 press release (the "September 17 Press Release") and a January 7, 2020 presentation (the "January 7 Presentation"), and Defendants respectfully refer the Court to the September 17 Press Release and the January 7 Presentation for a complete and accurate recitation of their contents. Defendants deny the allegations in the eighth sentence of Paragraph 1, except admit that three

---

[1] Except as otherwise indicated, the capitalized terms used in this Answer have the meanings ascribed to them in the Complaint. The use of such defined terms is solely for convenience and is not intended as an admission of any allegation of fact or law.

proxy advisory firms recommended that shareholders vote on Harbert's card for the Enzo election, that Enzo dropped its opposition to the election of the HDF Nominees when it was clear that they would be elected to the Board regardless of Enzo's position, and the HDF Nominees were elected to three year terms.

2. Defendants deny the allegations in the first and third sentences of Paragraph 2 of the Complaint. The second sentence of Paragraph 2 contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence. The first clause of the fourth sentence of Paragraph 2 purports to quote from a December 9, 2019 letter (the "December 9 Letter") from Harbert to Enzo shareholders, and Defendants respectfully refer the Court to the December 9 Letter for a complete accurate recitation of its contents. Defendants lack information and knowledge sufficient to admit or deny the remaining allegations in the fourth sentence of Paragraph 2. Defendants lack information and knowledge sufficient to admit or deny the allegations in the fifth sentence of Paragraph 2. The first part of the sixth sentence of Paragraph 2 purports to quote from the December 9 Letter, and Defendants respectfully refer the Court to the December 9 Letter for a complete accurate recitation of its contents. Defendants lack information and knowledge sufficient to admit or deny the remaining allegations in the sixth sentence of Paragraph 2. The seventh sentence of Paragraph 2 of the Complaint purports to quote from an email that Mr. Lucas sent to directors of Enzo on October 16, 2020. Defendants refer to that communication for a complete and accurate recitation of its contents. Defendants otherwise deny the remaining allegations in the seventh sentence of Paragraph 2 of the Complaint. Defendants deny the allegations in the eighth sentence of Paragraph 2 of the Complaint.

3. Defendants deny the allegations Paragraph 3 of the Complaint, except admit that Harbert had communications with the HDF Nominees, including about the lawsuit and that Defendants voluntarily dismissed the lawsuit on July 17, 2020 in a joint stipulation to the Court.

4. Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 4 of the Complaint.

5. Defendants deny the allegations in the first sentence of Paragraph 5 of the Complaint. Defendants admit that Harbert nominated directors who had studied Enzo, planned to develop strategic plans for the Company, would be independent directors, and would act in the best interest of all shareholders. Defendants otherwise deny the allegations in the second sentence of Paragraph 5. Defendants lack information and knowledge sufficient to admit or deny the allegations in the third sentence of Paragraph 5. The fourth sentence of Paragraph 5 contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in the fourth sentence of Paragraph 5.

6. Defendants admit the allegations in the first and second sentences of Paragraph 6 of the Complaint. Defendants deny the allegations in the third sentence of Paragraph 6 of the Complaint. The fourth and fifth sentences of Paragraph 6 purport to characterize and quote from a November 18, 2020 letter (the "November 18 Letter"). Defendants respectfully refer the Court to the November 18 Letter for a complete and accurate recitation of its contents. Defendants lack information and knowledge sufficient to admit or deny the allegations in the sixth sentence of Paragraph 6 of the Complaint. Defendants deny the allegations in the seventh sentence of Paragraph 6 and respectfully refer the Court to the November 18 Letter for a complete and accurate recitation of its contents.

4

7.     Defendants deny the allegations in the first sentence of Paragraph 7 of the Complaint.  The second sentence of Paragraph 7 contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 7.

8.     Paragraph 8 of the Complaint contains legal conclusions and arguments to which no response is required.

9.     Paragraph 9 of the Complaint contains legal conclusions and arguments to which no response is required.

10.     Paragraph 10 of the Complaint contains legal conclusions and arguments to which no response is required.

11.     Defendants admit the allegations in Paragraph 11 of the Complaint.

12.     Defendants admit the allegations in Paragraph 12 of the Complaint.

13.     Defendants admit the allegations in Paragraph 13 of the Complaint.

14.     Defendants admit the allegations in Paragraph 14 of the Complaint.

15.     Defendants admit the allegations in the first sentence of Paragraph 15 of the Complaint.  Defendants deny the allegations in the second sentence of Paragraph 15 of the Complaint.

16.     Defendants admit the allegations in Paragraph 16 of the Complaint.

17.     Defendants admit the allegations in Paragraph 17 of the Complaint.

18.     Defendants admit the allegations in Paragraph 18 of the Complaint.

19.     Defendants admit the allegations in Paragraph 19 of the Complaint, except lack information and knowledge sufficient to admit or deny that Rabbani is a member of the "American Society of Microbiology."

20.     Defendants deny the allegations in Paragraph 20 of the Complaint, except admit that Harbert often invests in illiquid small or micro-cap companies and avers that, of the 63 portfolio companies Defendants have invested in, Harbert has nominated or recommended individuals who joined the boards of 4 portfolio companies, including Enzo.

21.     Defendants deny the allegations in Paragraph 21 of the Complaint.

22.     Defendants admit the allegations in the first sentence of Paragraph 22 of the Complaint.  Defendants deny the allegations in the second sentence of Paragraph 22 of the Complaint.

23.     Defendants admit the allegations in Paragraph 23 of the Complaint.

24.     Defendants deny the allegations in Paragraph 24 of the Complaint, except admit that Harbert requested that the Company replace two of its five directors, declassify its board, and provide an observer role for Kenan Lucas.

25.     Defendants admit the allegations in the first sentence of Paragraph 25 of the Complaint.  Defendants lack information and knowledge sufficient to admit or deny the allegations in the second sentence of Paragraph 25 of the Complaint.  Defendants deny the allegations in the third sentence of Paragraph 25 of the Complaint.

26.     Defendants admit the allegations in first sentence of Paragraph 26 of the Complaint.  Defendants lack information and knowledge sufficient to admit or deny the

6

allegations in the second through seventh sentences of Paragraph 26 of the Complaint. Defendants deny the allegations in the eighth sentence of Paragraph 26 of the Complaint.

27. Defendants deny the allegations in the first sentence of Paragraph 27 of the Complaint. Defendants admit the allegations in the second and third sentences of Paragraph 27. Defendants admit the allegations in the footnote attached to the second sentence of Paragraph 27.

28. Paragraph 28 of the Complaint purports to quote from the September 17 Press Release, and Defendants respectfully refer the Court to that press release for a complete and accurate recitation of its contents.

29. Defendants admit the allegations in the first sentence of Paragraph 29 of the Complaint. The second and third sentences of Paragraph 29 purport to quote from the September 17 Press Release, and Defendants respectfully refer the Court to that press release for a complete and accurate recitation of its contents.

30. Paragraph 30 of the Complaint purports to characterize the December 9 Letter to Enzo's shareholders, and Defendants respectfully refer the Court to the letter for a complete and accurate recitation of its contents. Defendants otherwise deny the allegations in the first sentence of Paragraph 30. Defendants admit the allegations in the second and third sentences of Paragraph 30.

31. Paragraph 31 of the Complaint purports to quote from the December 9 Letter, and Defendants respectfully refer the Court to the letter for a complete and accurate recitation of its contents. Defendants otherwise deny the allegations in Paragraph 31.

32.     Defendants admit the allegations in Paragraph 32 of the Complaint and respectfully refer the Court to the January 8 Press Release and January 7 Presentation for a complete and accurate recitation of their contents.

33.     Paragraph 33 of the Complaint purports to quote from the January 7 Presentation, and Defendants respectfully refer the Court to the presentation for a complete and accurate recitation of its contents.  Defendants otherwise deny the allegations in Paragraph 33.

34.     Defendants admit the allegations in Paragraph 34 of the Complaint and respectfully refer the Court to a January 27, 2020 letter (the "January 27 Letter") for a complete and accurate recitation of its contents.

35.     Paragraph 35 of the Complaint purports to quote from the January 27 Letter, and Defendants respectfully refer the Court to that letter for a complete and accurate recitation of its contents.

36.     Defendants deny the allegations in Paragraph 36 of the Complaint, except admit that Harbert's proxy campaign influenced the recommendations of the three proxy advisory firms.

37.     Paragraph 37 of the Complaint purports to quote from statements made by Egan-Jones Proxy Services, Institutional Shareholder Services, Inc., and Glass, Lewis & Co. (collectively, the "Proxy Advisory Statements"), and Defendants respectfully refer the Court to those statements for a complete and accurate recitation of their contents.  Defendants otherwise deny the allegations in Paragraph 37.

38.     Defendants admit that on January 28, 2020, Enzo issued a press release (the "January 28 Press Release") and Paragraph 38 of the Complaint purports to describe a January

28 Press Release.  Defendants respectfully refer the Court to the January 28 Press Release for a complete and accurate recitation of its contents.

39.    Defendants deny the allegations in Paragraph 39 of the Complaint.

40.    Defendants admit the allegations in Paragraph 40 of the Complaint.

41.    Defendants admit the allegations in the first and second sentences of Paragraph 41 of the Complaint.  Defendants deny the allegations in the third sentence of Paragraph 41 of the Complaint.

42.    Defendants admit the allegations in Paragraph 42 of the Complaint.

43.    Defendants deny the allegations in Paragraph 43 of the Complaint.

44.    Defendants deny the allegations in Paragraph 44 of the Complaint.

45.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 45.

46.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 46, but deny that Dov Perlysky is an independent director.

47.    The first sentence of Paragraph 47 of the Complaint contains legal conclusions or argument to which no response is required.  To the extent a response in required, Defendants deny the allegations in the first sentence, as well as the second sentence, in Paragraph 47.

48.    Defendants admit the allegations in the first sentence of Paragraph 48 of the Complaint.  Defendants deny the allegations in the second sentence of Paragraph 48, except admit that Fabian Blank lives in Germany and aver that Peter Clemens lives in Tennessee.  Defendants also aver that the HDF Nominees requested to visit the Company's lab immediately

after the Annual Meeting, but the Company did not allow them to visit before the COVID-19 pandemic disrupted travel.

49.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 49 of the Complaint.

50.     Defendants lack information and knowledge sufficient to admit or deny the allegations regarding the HDF Nominees' proposed plans in Paragraph 50 of the Complaint. Defendants deny the remaining allegations in Paragraph 50.

51.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 51.

52.     Paragraph 52 purports to quote from the January 7 Presentation, and Defendants respectfully refer the Court to that presentation for a complete and accurate recitation of its contents.  Defendants otherwise deny the allegations in Paragraph 52.

53.     Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations in Paragraph 54 of the Complaint, except admit that Harbert communicated with the HDF Nominees after they joined the Board.

55.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 55 of the Complaint.

56.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 56 of the Complaint.

57.     Defendants deny the allegations in Paragraph 57 of the Complaint.

58.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 58 of the Complaint.

59.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 59 of the Complaint.

60.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 60 of the Complaint.

61.    Paragraph 61 of the Complaint purports to quote from the November 18 Letter, and Defendants respectfully refer the Court to that letter for a complete and accurate recitation of its contents.

62.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 62 of the Complaint.

63.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 63 of the Complaint.

64.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 64 of the Complaint.

65.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 65 of the Complaint.

66.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 66 of the Complaint

67.    Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 67 of the Complaint.

68.    Paragraph 68 of the Complaint purports to quote from a July 23, 2020 Roumell Asset Management statement (the "July 23 Roumell Statement"), and Defendants respectfully refer the Court to that statement for a complete and accurate recitation of its contents.

11

69.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 69 of the Complaint.

70.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 70 of the Complaint.

71.     Paragraph 71 of the Complaint contains legal conclusions and arguments to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 71.

72.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 72 of the Complaint.

73.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 73 of the Complaint.

74.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 74 of the Complaint.

75.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 75 of the Complaint.

76.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 76 of the Complaint.

77.     Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 77 of the Complaint.

78.     Defendants admit the allegations in the first sentence of Paragraph 78 of the Complaint.  The second sentence in Paragraph 78 purports to characterize the November 18 Letter.  Defendants respectfully refer the Court to that letter for a complete and accurate

recitation of its contents. Defendants otherwise deny the allegations in the second sentence of Paragraph 78.

79. Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 79 of the Complaint.

80. Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 80 of the Complaint.

81. Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 81 of the Complaint.

82. Defendants lack information and knowledge sufficient to admit or deny the allegations in Paragraph 82 of the Complaint.

83. Defendants deny the allegations in Paragraph 83 of the Complaint, except admit that Enzo's stock closed at $3.64 on September 16, 2019 and that Enzo's stock closed at $1.98 on November 17, 2020.

84. Defendants repeat their responses to each and every allegation contained in the preceding paragraphs of the Complaint with the same force and effect as is fully set forth herein.

85. Paragraph 85 of the Complaint contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 85.

86. Paragraph 86 purports to characterize and quote from the September 17 Press Release. Defendants respectfully refer the Court to that press release for a complete and accurate recitation of its contents. Defendants otherwise deny the allegations in the first sentence of Paragraph 86.

87.    Paragraph 87 of the Complaint purports to characterize and quote from the December 9 Letter. Defendants respectfully refer the Court to that letter for a complete and accurate recitation of its contents. Defendants otherwise deny the allegations in the first sentence of Paragraph 87.

88.    Paragraph 88 of the Complaint purports to characterize and quote from the January 8 Press Release and the January 7 Presentation. Defendants respectfully refer the Court to the press release and presentation for a complete and accurate recitation of their contents. Defendants otherwise deny the allegations in the first sentence of Paragraph 88.

89.    Paragraph 89 of the Complaint purports to characterize and quote from the January 27 Letter. Defendants respectfully refer the Court to that letter for a complete and accurate recitation of its contents. Defendants otherwise deny the allegations in the first sentence of Paragraph 89.

90.    Paragraph 90 of the Complaint contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 90.

91.    Defendants deny the allegations in Paragraph 91 of the Complaint.

92.    Paragraph 92 of the Complaint contains legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 92.

93.    Paragraph 93 purports to characterize statements made by Defendants. Defendants respectfully refer the Court to those statements for complete and accurate recitations

14

of their contents.  Defendants otherwise deny the that they had a plan to take control of the Board and force a fire sale of the Company.

94.    Paragraph 94 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 94.

95.    Paragraph 95 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 95.

96.    Paragraph 96 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 96.

97.    The first sentence of Paragraph 97 of the Complaint purports to quote from the July 23 Roumell Statement, and Defendants respectfully refer the Court to that statement for a complete and accurate recitation of its contents.  Defendants deny the allegations in the second sentence of Paragraph 97.

98.    Paragraph 98 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 98.

99.    Paragraph 99 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 99.

100.    Paragraph 100 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 100.

101.    Paragraph 101 of the Complaint contains legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 101.

102.    Paragraph 102 of the Complaint contains legal conclusions and argument to which no response is required.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof they otherwise would not bear, Defendants assert the following affirmative or other defenses.  Defendants reserve the right to assert further defenses as the case proceeds.

### FIRST DEFENSE

Plaintiff's Complaint, and each and every cause of action asserted therein, fails to state a valid claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, election of remedies, estoppel, laches, acquiescence, in pari delicto, and/or unclean hands.

### THIRD DEFENSE

The injuries alleged by Plaintiff were caused, in whole or in part, by the conduct of third parties for whom Defendants were not responsible, or through the acts or omissions on the part of the Plaintiffs, including failure to mitigate damages.

**FOURTH DEFENSE**

Any alleged harm suffered by Plaintiff was not directly or proximately caused by any conduct or act of Defendants or by any person or entity whose acts may be attributed to Defendants for any reason.

**FIFTH DEFENSE**

Plaintiff's claims are barred because of ratification, agreement, acquiescence, or consent to Defendants' alleged conduct.

**SIXTH DEFENSE**

Plaintiff has failed to mitigate, minimize, or avoid any losses allegedly sustained.

**SEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by lack of standing.

**EIGHTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because they are moot.

**NINTH DEFENSE**

Defendants specifically give notice that they intend to assert such other defenses as may become available by law, pursuant to statute, or during discovery, and hereby reserve their right to amend their Answer and assert such other and additional defenses.

## COUNTERCLAIMS OF DEFENDANTS HARBERT DISCOVERY FUND, LP AND HARBERT DISCOVERY CO-INVESTMENT FUND I, LP

As and for their Counterclaims against Enzo and additional Counterclaim Defendants Elazar Rabbani, Barry W. Weiner, Bruce A. Hanna, Dov Perlysky, Rebecca Fischer, Mary Tagliaferri, and Ian B. Walters (collectively the "Counterclaim Director Defendants" and, together with Enzo, the "Counterclaim Defendants"), Harbert Discovery Fund, LP and Harbert Discovery Co-Investment Fund I, LP ("Counterclaim Plaintiff" or "HDF"), by and through their attorneys, Schulte Roth & Zabel LLP, allege as follows:

### NATURE OF THE ACTION

1.      Enzo Biochem, Inc. ("Enzo" or the "Company") is a publicly traded company that is dominated by two men who are brothers-in-law:  Chairman and Chief Executive Officer ("CEO") Elazar Rabbani and President Barry W. Weiner.  Rabbani and Weiner treat the Company as their family's personal fiefdom and, in gross violation of their fiduciary duties to the Company's shareholders, have manipulated Enzo's corporate machinery to maintain their personal control over the Company, taking extraordinary measures to prevent the Company's shareholders from nominating, electing, and retaining their chosen representatives to the Company's Board of Directors (the "Board").

2.      During the 2019 Proxy Season, HDF, Enzo's largest shareholder, nominated two well-qualified, independent director candidates (the "HDF Nominees") for the two seats up for election at the upcoming annual meeting of shareholders (the "2019 Annual Meeting"),[2]

---

[2] The 2019 Annual Meeting concluded the 2019 Proxy Season (as the 2020 Annual Meeting concluded the 2020 Proxy Season).  Accordingly, even though the 2019 Annual Meeting took place in early 2020, it is referred to herein as the **2019** Annual Meeting.

including the seat held by Counterclaim Defendant Weiner.  By January 28, 2020, three days before the election, with most of the expected votes cast, it was clear that HDF would prevail.

3.      In response, the Board took decisive but illegal action to thwart the will of the shareholders.  After the market close on January 28, 2020, Enzo announced in a press release filed with the Securities and Exchange Commission ("SEC") as solicitation materials (the "January 28 Enzo Press Release," attached hereto as Exhibit A) that the 2019 Annual Meeting would be "delay[ed]" from January 31, 2020 until February 25, 2020.

4.      In addition, recognizing that it was too far behind in votes to defeat the HDF Nominees, Enzo shifted tactics.  In the same press release in which it announced the delay of the annual meeting, the Company disclosed that it would no longer oppose the HDF Nominees, and instead would seek shareholder approval to expand the size of the Board by at least one additional seat (the "Proposed By-Law Amendment") in a desperate attempt to keep Weiner on the Board and reduce the influence of the HDF Nominees.

5.      Subsequently, it was revealed that the Company's January 28, 2020 announcement that the annual meeting was delayed was instead a trick designed to buy the Board more time to carry out its improper plan.  At 7:07 a.m. on January 31, 2020, Enzo filed a supplement to its proxy statement with the SEC (the "January 31 Enzo Proxy," attached hereto as Exhibit B) announcing that it would in fact convene the 2019 Annual Meeting as originally scheduled, less than two hours later, at 9:00 a.m., in New York City and then adjourn and reconvene the meeting on February 25, 2020.

6.      Relying on Enzo's prior disclosure that no meeting was to be held on January 31, 2020, HDF, which is based in Alabama, cancelled its plans to send a representative to New York.  Had HDF been able to attend the 2019 Annual Meeting, it would have voted the shares and

19

proxies it held to defeat any motion to adjourn and forced the Company to hold the meeting as planned that day, ensuring the election of its two nominees and the defeat of Counterclaim Defendant Weiner.

7.    The Counterclaim Director Defendants' entrenchment efforts fooled no one, and received scathing criticism from all three leading independent proxy advisory firms.  For example, Glass, Lewis & Co. ("Glass Lewis") stated that "we are inclined to argue the current Enzo directors have manipulated Enzo's corporate machinery in the extreme, giving rise to a brazen 11th-hour effort to supersede a shareholder vote in order to further the entrenchment of an incumbent member."

8.    Ultimately, the Counterclaim Director Defendants' entrenchment efforts failed. The 2019 Annual Meeting was held, and the Company's stockholders decisively rejected the Proposed By-Law Amendment and Weiner's candidacy.

9.    Unfortunately, this was not the end of the Board's entrenchment actions.  As soon as the HDF Nominees took their seats on the Board, the other members of the Board prevented the HDF Nominees from doing their job.  The other Board members engaged in extraordinary actions, among other things, refusing to allow the newly elected directors to visit the Company's laboratories, denying them access to routine on-boarding materials, prohibiting them from communicating with the Company's largest shareholder, which had nominated them for election, and otherwise creating an extremely hostile environment.  In response to the Board's pressure tactics, the HDF Nominees abruptly resigned in mid-November 2020.

10.    The Board continued its entrenchment activities into the 2020 Proxy Season.  On November 27, 2020, the Company announced its slate of director nominees.  That same day, the Company sued Harbert in the instant lawsuit for purported misstatements that took place in the

2019 Proxy Season in a blatant attempt to silence HDF and prevent it from participating in the shareholder franchise.

11.     When Harbert demanded that the Company withdraw its Complaint, explaining that it was baseless and served no purpose because Harbert had no intention of nominating directors for the 2020 Proxy Season, the Board responded by blatantly breaching its fiduciary duties, yet again.  The Company stated that it would agree to drop the lawsuit only if Harbert entered into a standstill agreement, which would have prohibited Harbert – the Company's largest shareholder – from nominating its own directors for election and required it to support the Company's nominees for director and other proposals for a three-year period.  In making that demand, in which Defendants sought to swing a 10% shareholder from opposing to supporting their election and to otherwise silence criticism of their tenure, the Counterclaim Director Defendants improperly elevated their personal interests over those of the Company that they were elected to serve.

12.     Moreover, the Company's purportedly "independent" directors have not fulfilled their duties to check Rabbani and Weiner's abuse of power.  That is most starkly illustrated by recent events.  Even though Rabbani ran unopposed for his Board seat (a seat he has held for 40 years) at the Company's most recent annual meeting (the "2020 Annual Meeting"), the majority of voting shareholders voted *against* Rabbani, triggering a mandatory obligation in the Company's By-Laws for Rabbani to tender his resignation of his Board seat.  Remarkably, the Board then refused to accept Rabbani's resignation, and he remains Chairman of the Board, despite having been repudiated by the Company's shareholder base in an uncontested election. In an effort to appease the shareholder base, the Board announced that Rabbani would step down from his CEO role when a suitable replacement was found, but that announcement was over six

months ago and no replacement has been named. Today, Rabbani remains Chairman and CEO of the Company, and the shareholder franchise remains thwarted.

13.    Rabbani and Weiner have operated with impunity and contempt for the shareholder franchise and their blatant abuses of power have not been checked by the purportedly independent directors. Through this action, HDF seeks to curb those abuses and obtain redress for them. Accordingly, HDF has brought claims against Enzo for having made false and misleading statements in violation of Section 14(a) and Rule 14a-9 of the Securities and Exchange Act (the "Exchange Act") and the Counterclaim Director Defendants for control person liability and for breaching their fiduciary duties under New York law.

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Counterclaim Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District. Enzo conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including, without limitation, the preparation and dissemination to the public of materially false and misleading information and the convening of the 2019 Annual Meeting, occurred in this District.

16.    The Court has personal jurisdiction over each Counterclaim Defendant because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction

22

over Counterclaim Defendants by this Court permissible under traditional notions of due process and under Section 27 of the Exchange Act.

## THE PARTIES

17.     Counterclaim Plaintiff Harbert Discovery Fund, LP is a Delaware limited partnership that beneficially owns 3.64% of the outstanding shares of Enzo.

18.     Counterclaim Plaintiff Harbert Discovery Co-Investment Fund I, LP is a Delaware limited partnership that beneficially owns 7.04% of the outstanding shares of Enzo. Counterclaim Plaintiffs Harbert Discovery Fund, LP and Harbert Discovery Co-Investment Fund I, LP beneficially own 10.68% of the outstanding shares of Enzo, making them, collectively, the Company's largest shareholders.

19.     Counterclaim Defendant Enzo Biochem, Inc. is a New York corporation with its principal place of business in New York, New York.  Enzo operates a diagnostic laboratory and develops, manufactures, and sells technology to clinical laboratories.

20.     Counterclaim Defendant Elazar Rabbani is a co-founder and director of Enzo, and has been a director since 1976.  Rabbani is also the Company's Chairman and CEO.

21.     Counterclaim Defendant Barry W. Weiner is a co-founder and was a director of Enzo from 1977 until March 2020.  Weiner has served as the Company's President since 1996 and, until 2020, held the position of Chief Financial Officer and Executive Vice President.

22.     Counterclaim Defendant Rebecca J. Fischer is a director of Enzo, and has been a director since January 2020.

23.     Counterclaim Defendant Bruce A. Hanna was a director of Enzo from January 2017 until approximately February 2020.

24.     Counterclaim Defendant Dov Perlysky is a director of Enzo, and has been a director since January 2012.  Although the Company describes Perlysky as the "lead independent director," he is not independent of Rabbani.  Perlysky's father-in-law, Morty Davis, is the banker who originally took the Company public and Davis is a close personal friend of Rabbani.  Perlysky is not independent of Rabbani and Weiner, and instead acts as the longtime family friend that he is.

25.     Counterclaim Defendant Mary Tagliaferri is a director of Enzo, and has been a director since November 2020.

26.     Counterclaim Defendant Ian B. Walters is a director of Enzo, and has been a director since November 2020.

## FACTS

### A.  Enzo's History of Domination by Rabbani and Weiner

27.     Founded in 1976 by Rabbani, Weiner, and Shahram Rabbani, Enzo is a self-proclaimed leader in the life sciences and biotechnology industry.  Since its founding, the Company has concentrated on the development of enabling technologies in the areas of gene regulation and gene medication.  The business operations of the Company are performed by Enzo Life Sciences, Enzo Therapeutics, and Enzo Clinical Labs.

28.     Prior to the 2019 Annual Meeting, Enzo's Board included Rabbani and Weiner: co-founders and brothers-in-law who have each been on the Board for over 40 years.  Serving alongside them on the Board were Fischer, Hanna, and Perlysky.  The Company's culture of nepotism and "family feuds" has negatively impacted the Company from the top down through unchecked, blatant abuse of power and resources, particularly by Rabbani and Weiner.

29.     Between the years of 2004 and 2019, Enzo reported operating losses every year, totaling a negative operating income of $186 million, excluding legal expenses and settlements. During that time period, the Board approved paying Rabbani and Weiner over $34 million in salaries and bonuses.  Meanwhile, shareholders saw cumulative total shareholder returns decline 80% during the same period.

30.     From December 31, 2009 to December 31, 2019, the Board presided over a 51% decline in the Company's share price, during which time the S&P 500 had positive returns of 190% and the Russell 2000 Index had positive returns of 167%.  Those returns are not surprising given the mismanagement, ineffective strategy, weak governance, misaligned incentives, and poor capital allocation of the Company.

**B.  HDF's Case for Change**

31.     After careful diligence, HDF concluded that Enzo had valuable assets but was deeply undervalued.  HDF began investing in Enzo because it believed that, with a sound strategy, prudent expense structure, appropriate capital allocation, and effective, independent oversight, the Company could increase significantly in value.

32.     By 2019, HDF was the largest shareholder in the Company, owning approximately 11.8% of the Company's outstanding shares at the time.

33.     Beginning in October 2018, HDF attempted to engage constructively with Enzo by having calls and meetings with management to discuss strategy, attending the annual meeting of shareholders, and touring the Company's laboratory.

34.     In May 2019, HDF requested that Enzo replace, prior to its 2019 Annual Meeting, two of its incumbent directors with two candidates put forth by HDF, declassify the Board so that all directors would be elected annually rather than on staggered terms, and create a Board

25

observer role for one of HDF's representatives.  Enzo never provided a meaningful response to HDF's proposal.

35.     Given the lack of progress, HDF decided to exercise its stockholder franchise and nominate new directors for election at the Company's 2019 Annual Meeting, which, pursuant to its By-Laws, would be held in January 2020.  As the Company has a classified board, only certain board seats are up for election in certain years.  For the 2019 Proxy Season, two of the Company's five board seats would be up for election.

36.     On September 17, 2019, HDF announced that it would nominate two highly qualified independent director candidates – Fabian Blank and Peter Clemens – for election at the upcoming 2019 Annual Meeting.  Blank and Clemens have deep operational, financial, and strategic experience within the healthcare industry.  HDF believed that both candidates would bring their substantial experience to help steer the Company in the direction of long-term value creation for all shareholders.

37.     On December 5, 2019, Enzo gave formal notice that the 2019 Annual Meeting would be held on January 31, 2020.  Enzo also formally opposed the HDF Nominees and solicited proxies in support of Weiner and Hanna, whom the Board re-nominated for election at the 2019 Annual Meeting.

38.     In the midst of the proxy fight, Enzo made two announcements in apparent concession to HDF, which was obtaining strong shareholder support for its slate.  First, on December 18, 2019, Enzo announced that Weiner would step down as CFO but would remain as President and continue to stand for re-election at the upcoming 2019 Annual Meeting.

26

39.     Second, on December 31, 2019, Enzo announced that director Gregory M. Bortz would be replaced by Counterclaim Defendant Rebecca J. Fischer for one of the three seats that was not being contested at the 2019 Annual Meeting.

40.     The proxy contest continued through January 2020, with both sides releasing extensive fight decks and public rebuttals.

41.     During the course of the 2019 Proxy Season, the Company made repeated misstatements about HDF and the HDF Nominees, including HDF's investment experience, the qualifications of the HDF Nominees, and the relationship between HDF and the HDF Nominees. Each of those misstatements caused HDF to incur additional costs during the 2019 Proxy Season.

## C.  All Three Leading Proxy Advisory Services Endorse Voting on HDF's Card

42.     The HDF Nominees received remarkable support.  All three leading proxy advisory firms recognized the need for change at Enzo and recommended that their clients vote on HDF's proxy card, highlighting the strength of HDF's position.

43.     Proxy advisory firm Glass Lewis recommended that Enzo shareholders vote on HDF's proxy card for both of HDF's nominees, as HDF "submit[ted] the much stronger fundamental case" than did the Board's nominees.  Glass Lewis concluded that, in stark contrast to HDF, the Board's nominees had merely offered "rehashed promises of pending value generation."

44.     Likewise, proxy advisory firm Egan-Jones recommended that shareholders vote on HDF's proxy card for both of HDF's nominees to the Board on the basis that doing so was "in the best interest of the Company and its shareholders."  Egan-Jones cited a "validated need for change, as evidenced by the Company's financial and operational underperformance,"

concluding that "there [exists] a compelling need to alter the Company's corporate governance structure and practices in order to protect the interests of the shareholders in the future."

45.     The third major proxy advisory firm, Institutional Shareholder Services ("ISS"), recommended that Enzo shareholders vote on HDF's proxy card for HDF nominee Blank on the grounds that he possessed the experience and perspective of which the Board was in dire need. ISS found that Blank's professional experience and business understanding would be "valuable to [Enzo]" and "additive to the board."

D.  **Faced with Imminent Defeat, the Board Delays the 2019 Annual Meeting and Proposes Expanding the Board to Save Weiner**

46.     Enzo's shareholders responded overwhelmingly favorably to HDF's campaign. Based on the January 28, 2020 preliminary voting report issued by Broadridge, the proxy services provider, which received voting instructions and proxies from Company shareholders to vote their shares, the HDF Nominees, Blank and Clemens, had the support of 80% and 61%; respectively, of the shares then voted, with a quorum of shares having been voted/instructed to vote on HDF's card, while the Company's two nominees had less than 20% of shares/voting instructions cast in their favor. Thus, at that time, the election of the HDF Nominees was all but assured, and the Company's two director nominees would be voted off the Board.

47.     After the close of the markets on January 28, 2020, the Company issued the January 28 Enzo Press Release, in which it stated that the Company's 2019 Annual Meeting, which had been scheduled to be held at 9:00 a.m. on January 31, 2020, was "delay[ed]" until February 25, 2020 so that the Company could add proposals that, in effect, would keep on a director who otherwise would have been voted off the Board.

28

48.     The January 28 Enzo Press Release was issued with the following sub-headline: Enzo "*Delays Annual Meeting Until Feb. 25.*" Exhibit A at PDF p. 4 (emphasis in original.) It further noted that the Company "is taking these actions **today**" to change the 2019 Annual Meeting and that "the Board will *delay* the Annual Meeting until February 25, 2020." Exhibit A at PDF p. 5 (emphasis added).

49.     On information and belief, the Company also notified Broadridge that the 2019 Annual Meeting date was changed to February 25, 2020. Consequently, Broadridge did not generate a vote report or issue a proxy in respect of the voting instructions that it received, as it normally would have done the day before an annual meeting.

50.     The image below is a screenshot of the Broadridge preliminary vote report for the afternoon of January 30, 2020, which notes that the scheduled meeting date is February 25, 2020. On information and belief, Broadridge only changes the annual meeting date in its system if it receives express instructions from an issuer, such as Enzo. Thus, in addition to issuing the January 28 Enzo Press Release, the Company appears to have advised Broadridge directly that the 2019 Annual Meeting was delayed for three weeks.

Broadridge Preliminary Vote Report from 1/30/20 Displaying a 2/25/20 Meeting Date

| RPT-CS | | JOB-P30793 | REC DT-12/03/19 | MTG DT-02/25/20 | ISSUER-ENZO BIOCHEM, INC. | RUN DT-01/30/2020 | RUN TM-15:30:15 | |
| VOTE TO | CL#-NAM | PROFILE | CUSIP | LEGAL PRC DIR EXP | NOMIN   VOTED | UNVOTED | % VOTED | 1. *-FOR   1. |

51.     With no realistic chance of defeating HDF's nominees, Enzo changed its strategy. The Company stated in the January 28 Enzo Press Release that it would no longer oppose the election of HDF's nominees. However, Enzo also announced that it would change the rules of election midstream by seeking shareholder approval for a Proposed By-Law Amendment to

expand the size of the Board from five to add at least one seat, with that seat belonging to Counterclaim Defendant Weiner, who otherwise would have been voted off the Board.

52.    Specifically, the Company stated in the January 28 Enzo Press Release that it would seek to "amend the bylaws to increase the size of the Board from five to six directors and provide the Board discretion to further increase the size of the Board to seven." Exhibit A at PDF p. 4. The January 28 Press Release falsely stated that the "proposed increase in Board size and diversity reflects the feedback and desire of Enzo's shareholders" – notwithstanding the fact that the shareholders were at that very moment overwhelmingly voting against the Company's nominees.

53.    An amendment was necessary to expand the Board because Article II, Section 2 of the Enzo's November 20, 2018 Amended and Restated By-Laws (the "By-Laws," attached hereto as Exhibit C) fixed the number of Board seats at five. It provides: "The number of directors constituting the Board shall be fixed at five (5)." Exhibit C at PDF p. 7.

54.    Further, the Proposed By-Law Amendment would require shareholder approval, pursuant to the Company's Articles of Incorporation (the "Charter").[3] *See* Exhibit D at Article 10, PDF pp. 3-4. The Charter specifically provides that Article II, Section 2 of the By-Laws cannot be amended without supermajority vote:

> Article II, Section[] 2 . . . of the By-Laws shall not be altered, amended, or repealed and no provision inconsistent therewith shall be adopted without the affirmative vote of (i) the holders of at least 80% of the voting power of the then outstanding shares of stock entitled to vote generally in the election of directors,

---

[3] The Certificate of Amendment of the Certificate of Incorporation of the Company, filed with the New York Department of State on July 22, 1988, is attached hereto as **Exhibit D**. There were no further amendments to the Certificate of Incorporation of the Company prior to the February 25, 2020 Annual Meeting. The language relevant to this action is contained in Exhibit D and, as such, that document is referred to as the "Charter" throughout. For the sake of completeness, the original Certificate of Incorporation and all amendments prior to the 1988 amendment reflected in Exhibit D are included as **Exhibit E**.

voting together as a single class, and (ii) a majority of such shares owned by persons not affiliated with an Interested Shareholder. . .

(such vote, the "Required Supermajority Vote").

55.     Thus, there is no question that, by any plain reading of the By-Laws and Charter, a Required Supermajority Vote was necessary for the number of Board seats to be expanded. The Required Supermajority Vote would be a difficult threshold for any publicly held company to achieve, and particularly for Enzo, which had not had more than 76% of outstanding shares represented in the years prior to the 2019 Annual Meeting.

### E.  After Declaring the January 31, 2020 Meeting Would Be Delayed, Enzo Convenes the Meeting on January 31, 2020 with Less than Two Hours' Notice

56.     Contrary to the clear statements in the January 28 Enzo Press Release regarding the "delay" of the Annual Meeting, the Company filed the January 31 Enzo Proxy at 7:07 a.m., announcing that the Annual Meeting would be convened as originally scheduled less than two hours later at 9:00 a.m. on January 31, 2020, at the Yale Club in New York City and then adjourned until February 25, 2020.  *See* Exhibit B at PDF p. 6.

57.     Disturbingly, the January 28 Enzo Press Release plainly was designed to ensure that no stockholder attended the 2019 Annual Meeting on January 31, so that the Company could buy itself more time to save Weiner's Board seat.  Misleading shareholders into not attending the annual meeting on January 31 was necessary for Enzo to carry out its plan because, if stockholders had known that the 2019 Annual Meeting was taking place, they would have been able to prevent its adjournment, elect the HDF Nominees to the Board, and avoid any vote on the Proposed By-Law Amendment.

31

58.    The procedural reason why Defendants needed to ensure that no shareholder attended the 2019 Annual Meeting is as follows.  Under New York law, the power of adjournment lies not with the Company, but with the holders of a majority of the shares present in person or by proxy at a meeting.  Under the Company's By-Laws, only in the event that no shareholder entitled to vote is present at an annual meeting does an officer of the Company have the ability to adjourn the Meeting.[4]

59.    Accordingly, the Company's January 28 Enzo Press Release had actual, material consequences, as the Company would not have been able to adjourn the 2019 Annual Meeting on January 31 had shareholders known that it was going to be convened at that time.  Having been misled by the Company's false statements, HDF, which is based in Alabama, was unable to attend the 2019 Annual Meeting on less than the two hours' notice provided by the Company. Likewise, after also having been misled, retail stockholders had canceled their plans to attend the 2019 Annual Meeting on January 31.

60.    Had the Company not falsely stated that the 2019 Annual Meeting was delayed, HDF would have attended the 2019 Annual Meeting on January 31, prevented the meeting's adjournment, and elected its two nominees, as HDF possessed sufficient proxies to do so. Instead, the Company was able to force through an adjournment that was both detrimental to the shareholder franchise and expressly taken to increase the size of the Board in an effort to avoid losing an incumbent inside director, Weiner, despite overwhelming shareholder opposition to his candidacy.

---

[4] Specifically, Article I, Section 6 of the By-Laws states: "In the absence of a quorum, the holders of a majority of the votes of the shares of stock present in person or by proxy and entitled to vote, or if no shareholder entitled to vote is present, then any officer of the Corporation may adjourn the meeting from time to time." Exhibit C at PDF p. 5.

32

**F. Enzo Outlandishly Claims That the By-Law Fixing the "Number" of Directors at "Five" Can Be Amended Without a Supermajority Vote Because It Was "Inadvertently" Placed in the Wrong Section of the By-Laws**

61.     In another truly astonishing move, the Board attempted to act in clear violation of the Charter by pursuing the Proposed By-Law Amendment *without* the Required Supermajority Vote.

62.     In a question-and-answer section of the January 31 Enzo Proxy, Enzo stated that the "By-Law Amendment to expand the board will be approved if it receives the affirmative vote of *a majority of the votes present in person or by proxy* by the holders of shares entitled to vote therein."  Exhibit B at PDF p. 13 (emphasis added).  Enzo justified its disregard of the Required Supermajority Vote as follows:

> Article II, Section 2 of the By-Laws currently states that the size of the Board is fixed at five members. The amendment to fix the size of the Board was **inadvertently added** to Article II, Section 2 of the By-Laws, which is a section whose amendment requires a supermajority vote of shareholders per the Company's certificate of incorporation (as amended, the "Charter"), rather than in Article II, Section 9 of the By-Laws. As a result, the supermajority shareholder vote requirement that applies to Article II, Section 2 does not apply to the provision fixing the size of the Board at five.

Exhibit B at PDF p. 13 (emphasis added).

63.     Counterclaim Defendants' inadvertence argument was obviously pretextual, and made in clear breach of their fiduciary duties with the primary purposes of entrenching Weiner in office and diluting the impact on the Board of the HDF nominees.

64.     First, Enzo cited no facts supporting its assertion that the provision fixing the number of Board seats at five was included in Article II, Section 2 "inadvertently."

65.     Second, the assertion that Article II, Section 9 is a more natural place than Article II, Section 2 to set the number of directors strains credulity.  Article II of the By-Laws is entitled

"Board of Directors." Article II, Section 2 is literally entitled "***Number*, Election and Terms.**" (italics added) and describes how the Board will be composed, that it will be divided into certain classes subject to election at different times, and how directors can be removed. Exhibit C at PDF p. 7. By contrast, Article II, Section 9, which is entitled "**Organization,**" provides that the Chairman of the Board will preside over all Board meetings and describes what happens if the Chairman is not present. *See id.* p. 8.

66.     Third, the provision setting the number of directors at five had been in Article II, Section 2 of the By-Laws for at least seven years. In the January 17, 2013 Amended and Restated By-Laws of Enzo Biochem, Inc., an identical provision was present in Article II, Section 2 as well. If the provision setting the number of Board members at five was in the wrong place in the By-Laws, surely someone at the Company would have noticed and corrected that mistake when the Company amended and restated the By-Laws on November 20, 2018.

67.     Fourth, the Company has, since 2013, repeatedly stated in its public filings that the number of Board seats is fixed at five members. Never once in any of its public filings has the Company ever noted that the provision setting the number of directors at five was inadvertently inserted into the wrong Section of the By-Laws. Shareholders like HDF have relied on the Company's disclosures and the plain meaning of the Charter and By-Laws to mean that the By-Law setting the Board at five members cannot be amended without the Required Supermajority Vote.

68.     Finally, the absurdity of what the Company was attempting to do is illustrated by the Proposed By-Law Amendment on its face. In the Proposed By-Law Amendment, the Company made clear its intent to amend Article II, Section 9 only:

34

Section 9. <u>Size and</u> <u>Organization</u>. <u>The number of directors constituting the Board shall be fixed at six (6); provided, however, that the Board shall have discretion to increase or decrease the size of the Board within the range of five (5) and seven (7) directors.</u> The Chairman of the Board shall act as chairman of and preside at all meetings of the Board at which he is present. If the Chairman of the Board shall be absent from

Exhibit B at PDF p. 15.

69.     Notwithstanding that, Article II, Section 2 would remain intact because it could not be amended without the Required Supermajority Vote. Thus, the Company was proposing that the By-Laws be amended to potentially expand the number of directors to seven, even though another, pre-existing By-Law, which would not be amended, expressly fixed the number at five. To advance such a proposal, which would have rendered the By-Laws internally inconsistent, was a fundamental dereliction of the Counterclaim Director Defendants' duties to the Company and to their shareholders, taken with the primary purpose of maintaining Counterclaim Director Defendant Weiner in office and diluting the influence of the HDF Nominees.

70.     After HDF criticized the Proposed By-Law Amendment for the above-stated reasons, the Counterclaim Defendants recognized the absurdity of their inadvertence argument and abandoned it.

71.     In particular, on February 11, 2020, the Counterclaim Director Defendants caused the Company to file a revised proxy, which modified the question-and-answer section where the inadvertence argument had been made. *See* Enzo February 11, 2020 Schedule 14A, attached hereto as Exhibit F, at PDF pp. 14-15. The Company struck the "inadvertently added" language and instead argued that the Board's own actions in 2010 and 2013 fixing the size of the Board at five were a nullity because *those* actions were carried out without the Required Supermajority Vote and thereby violated the Charter:

> The Board took action to unilaterally amend Article II Section 2 in 2010 and 2013. However, these amendments conflict with the 80%

35

supermajority shareholder approval requirement contained in the Charter. Under NY BCL § 601(b), the Charter of the Company controls where it conflicts with the By-Laws. Because each of these actions were in direct violation of the Charter, both the 2010 and 2013 amendments to Article II Section 2 had no legal effect. As a consequence of the foregoing, Article II Section 2 has remained, in fact, unchanged since the 1988 amendments. Therefore, the By-Laws do not speak to the size of the Board.

Exhibit F at PDF p. 15.

72. In a fight deck filed with the SEC on February 18, 2020, the Company listed among the reasons for pursuing the Proposed By-Law Amendment: "Certain other shareholders expressed a concern, shared by the Board, that **Harbert (an 11.8% shareholder) has demonstrated a desire to ultimately take control of the Company** and that Harbert having 2 of 5 seats (40% of currently sized Board) is too close to effective control." Enzo February 18, 2020 Schedule 14A, attached hereto as Exhibit G, at PDF p. 6 (emphasis in original). Accordingly, the Counterclaim Director Defendants expressly conceded that the Proposed By-Law Amendment was adopted to ensure their continued control of the Company by diluting the influence of HDF's two nominees who were likely to take two of the five Board seats.

## G. HDF Sues Enzo and the Board to Prevent Another Delay of the 2019 Annual Meeting and a Declaration That the Proposed By-Law Amendment Was Invalid

73. On February 5, 2020, HDF sued the Company and its then directors in this Court under the caption *Harbert Discovery Fund, LP et al. v. Enzo Biochem, Inc. et al.*, No. 20-cv-01021-MKV (S.D.N.Y.) (the "First Lawsuit"), seeking, among other things, an order preventing the Company from further delaying the 2019 Annual Meeting and seeking a declaration that the Proposed By-Law Amendment was invalid.

74.     During a preliminary conference held at Harbert's request, Judge Mary Kay Vyskocil noted that the Company's actions in adjourning the 2019 Annual Meeting and amending the By-Laws "smack a little bit of gamesmanship."

**H. Leading Proxy Advisory Services Issue Scathing Reports Criticizing the Counterclaim Director Defendants for their Entrenchment Tactics**

75.     As noted, all three leading proxy advisor services had recommended voting on HDF's card prior to the Board's adjournment of the 2019 Annual Meeting.   But after that adjournment and in response to the Proposed By-Law Amendment, the three advisory services issued scathing reports criticizing the Counterclaim Director Defendants' obvious entrenchment activities.

76.     On February 19, 2020, Glass Lewis issued a report containing the following condemnation of the Counterclaim Director Defendants' actions:

> At this juncture, we do not consider it particularly useful to rehash the substance of Harbert's original campaign, nor would we undertake any estimation of the possible outcome of the Dissident's ongoing litigation. Instead, we consider the focus here, irrespective of subsequently rendered judgments relating to proposal validity and applicable vote thresholds, should be firmly set on the publicly understood actions of Enzo immediately prior to and following the previously scheduled meeting. **In that regard, viewed in full, we are inclined to argue the current Enzo directors have manipulated Enzo's corporate machinery in the extreme, giving rise to a brazen 11th-hour effort to supersede a shareholder vote in order to further the entrenchment of an incumbent member.** (emphasis added)

77.     Likewise, on February 19, 2020, ISS issued the following report noting that Counterclaim Defendants had engaged in deceptive conduct designed to mislead shareholders:

> Had the board announced the proposed modifications at an earlier date, shareholders may have viewed the move as a genuine concession designed to provide the dissident nominees with a role, while simultaneously maintaining a degree of continuity. **However, given the timing of the**

**announcement (three days before the scheduled AGM and after an apparently strong showing of support for the dissident nominees), the board's assertion that it is somehow shareholder friendly is not only misleading, but arguably deceptive.** The amended agenda advantages management by attempting to force what amounts to a unilateral settlement, as the dissident would get two seats on a larger board (and would therefore have less influence) while Weiner's presence would be maintained for at least another year. Ultimately, it is unclear how this would benefit shareholders. As such, ISS recommends voting against the proposal to increase the board size on the dissident (BLUE) card. There are no changes to ISS' prior vote recommendation at this time. (emphasis added)

78.    Finally, on February 21, 2020, Egan-Jones Proxy Services called the Proposed By-Law for what it was, a clear act of entrenchment:

> **This [Proposed By-Law Amendment] is a clear attempt by the Company to further entrench ineffective directors in contravention of the clear desires of the shareholders**. This Board Size Bylaw, if adopted, would be inconsistent with the existing bylaw in Article II, Section 2 of the By-Laws, which says the Board size is five directors. (emphasis added)

**I.    The Proposed By-Law Amendment Is Soundly Rejected at the 2019 Annual Meeting and the HDF Nominees Receive Overwhelming Shareholder Support**

79.    The Company finally held its 2019 Annual Meeting on February 25, 2020.  The HDF Nominees were easily elected by wide margins.  For Fabian Blank, 25.7 million shares were voted in favor of his election, representing over 95% shareholder support.  For Peter Clemens, 19.3 million shares were voted in favor of his election, representing approximately 75% shareholder support.  *See* Exhibit H at PDF p. 4 (March 2, 2020 Enzo Form 8-K announcing final vote totals).

80.    Further, the Proposed By-Law Amendment was defeated even under the incorrect majority standard that the Board attempted to use:  11.7 million shares were voted in favor of the

Proposed By-Law Amendment and 21.8 million shares were voted against it. Thus, by a nearly two-to-one margin, shareholders rejected the Proposed By-Law Amendment.

**J.  After the 2019 Annual Meeting, the Parties Discuss the Need to Move Past the First Lawsuit and the Company Rejects the HDF Nominees' Request to Visit the Enzo Lab**

81.    After the 2019 Annual Meeting concluded on February 25, 2020, HDF, the HDF Nominees and the Company met and discussed the possibility of putting the events of the 2019 Proxy Season behind them, including resolving the First Lawsuit with the Company reimbursing HDF for some or all of its fees from the proxy contest in recognition of the corporate benefit that it had delivered through the election of the HDF Nominees.

82.    At that meeting, the HDF Nominees, neither of whom resided in New York, asked to visit the Enzo laboratory on Long Island while they were still in New York. Defendant Weiner declined their request, stating that it "was not a good time" for them to visit the lab. Following the meeting, the HDF Nominees returned to their respective homes in Germany and Tennessee, unaware that the COVID-19 pandemic would preclude them from visiting Enzo or the lab in the near future.

**K.  The HDF Nominees' Time on the Board is Marked by Turmoil, Obfuscation, and Overt Hostility by the Other Members of the Board**

83.    The HDF Nominees' election to the Board was certified on March 2, 2020. Soon thereafter, the COVID-19 pandemic effectively shut down all domestic and international travel and all non-essential in-person meetings in New York City, which effectively prevented the HDF Nominees from visiting Enzo in person.

84.    On information and belief, the day after the election was certified, Weiner spoke with Clemens regarding the First Lawsuit, claiming that the pendency of the litigation was

preventing Enzo from renewing its D&O insurance.  On information and belief, Weiner requested that Clemens reach out to Harbert to discuss the resolution of the First Lawsuit.  In accordance with that request, on March 3, 2020, Clemens wrote to Lucas in an e-mail "Give me a call when u can.  Just talked to Barry and Dave Bench regarding the Harbert lawsuit and implications with AIG on D&O Coverage."

85.    As one would expect, given that HDF had nominated them for election to the Board, after the HDF Nominees took their seats on the Board, Harbert had periodic communications with the HDF Nominees about the Company's strategic direction and the their ability to make change at the Company.  Additionally, Harbert discussed with the HDF Nominees the reimbursement of HDF's proxy expenses and the resolution of the First Lawsuit, as, on information and belief, Weiner had specifically instructed Clemens to do.

86.    Notwithstanding the understanding following the February 25, 2020 meeting that all the parties, including the HDF Nominees, would have discussions to resolve the First Lawsuit, the other members of the Board reversed position and accused the HDF Nominees of disloyalty for having discussed the resolution of the First Lawsuit with HDF.

87.    It subsequently became clear that the Counterclaim Director Defendants had no intention of putting the proxy contest behind them and instead were intent on setting a trap for the HDF Nominees in order to force their resignations from the Board.  As the HDF Nominees informed HDF, the Counterclaim Director Defendants' hostility to Harbert was so overt that, during a discussion about HDF, one of the other Board members stated "Fuck Harbert."

88.    Counterclaim Defendants' efforts to undermine the HDF Directors began as soon as they attempted to act in their capacities as Board members. When onboarding new directors, it is custom and practice to provide them with extensive background materials, including financial

information that is far more detailed than that which is publicly disclosed, such as product level contribution margins, performance relative to budget, R&D pipeline, recent analysis performed by third-party consultants or investment bankers. This allows new directors to obtain a deep understanding of the company's finances, operations and strategy, among other things.

89. In an extraordinary departure from that custom and practice, the Company refused to provide critical information about the Company to the HDF Nominees and then used the HDF Nominees' requests for that information as purported evidence in the Complaint that the HDF Nominees were not qualified or prepared for their roles as independent directors. The HDF Nominees became so frustrated with the Company that they inquired with Harbert about seeking legal counsel to understand their information rights as directors.

90. Moreover, according to Enzo's own Complaint, the Board demanded that the HDF Nominees submit a "strategic plan" to the Company, without the benefit of materials typically provided to Company directors. That request was not made in good faith to two newly elected members of the Board who had been overwhelmingly supported by the Company's shareholders at the 2019 Annual Meeting. Instead, it was a set up to provide the Counterclaim Director Defendants with a pretext to claim that HDF Nominees were somehow not qualified.

91. On or about May 28, 2020, the Board implemented a policy that prohibited individual directors from speaking to shareholders without the participation of the entire Board. That policy was part and parcel of the Board's plan to disenfranchise the HDF Nominees by isolating them from the counsel of the Company's largest shareholder, which had sponsored their election to promote change at the Company. Thereafter, the Harbert Nominees did not communicate directly with Harbert unless the entire Board was copied on the communications.

41

**L. HDF Voluntarily Dismisses the First Lawsuit Without Prejudice**

92.   As of July 2020, Enzo had not yet answered or moved to dismiss HDF's operative Complaint in the First Lawsuit; however, Enzo had indicated that it planned to move to dismiss. In order to save the unnecessary burden and expense of litigation, Harbert decided to dismiss the lawsuit *without prejudice* so that, if necessary, it could assert the claims again at a later time. The dismissal was effective on July 16, 2020.

**M. The HDF Nominees Abruptly Resign from the Board, Enzo Replaces Them and the Board Promptly Engages in Further Entrenchment During the 2020 Proxy Season**

93.   On November 9 and 10, 2020 the HDF Nominees took the unusual step of resigning from the Board less than nine months after their election.  HDF was surprised by their resignations.

94.   Based on the timing and unexpected nature of the resignations, Harbert believes that Rabbani had created such an extremely hostile environment in the boardroom that the HDF Nominees found their position untenable as minority members in opposition to Rabbani's continued mismanagement.

95.   The rapid replacement of the HDF Nominees, with the Counterclaim Director Defendants' hand-picked successors, further underscores Counterclaim Defendants' scheme to cement their control of the boardroom. Typically, the selection and appointment process for new directors of a publicly traded company takes no less than a month.  Among other things, when appointing directors, a public company conducts a search process, interviews potential candidates, deliberates and the secures the agreement of the candidates to serve as directors. That apparently was not the case with Enzo.

96.     On November 17, 2020 and November 25, 2020, the Board appointed Mary Tagliaferri and Ian Walters, respectively, to the two seats on the Board left vacant by the resignation of the HDF Nominees.  Thus, less than two weeks after the HDF Nominees resigned, the Company had already selected and appointed their successors. The availability of Tagliaferri and Walters on apparent standby confirms that the other members of the Board – Rabbani, Perlysky, and Fischer – had planned to force the HDF Nominees' resignation and replace them with friendly directors.

97.     On November, 27, 2020, Enzo filed its first proxy statement for the 2020 Proxy Season, soliciting proxies to elect Tagliaferri and Walters to the seats they had been appointed to and also soliciting proxies to re-elect Rabbani to the Board.  *See* Enzo Nov. 27, 2020 Schedule 14A Definitive Proxy Statement, attached hereto as Exhibit I.

98.     The ***same day*** that it filed its proxy statement, Enzo initiated this action against Harbert.  At that time, Enzo clearly anticipated that Harbert would again nominate directors, as the Complaint alleges that "Harbert plans to present additional candidates for Enzo's Board in upcoming elections" and "[t]he election of more unqualified directors put forward by Harbert based on its misstatements would also harm Enzo and its shareholders."  However, Harbert had no such intention.

99.     Plainly, the Enzo Complaint was meant to serve as a preemptive strike to prevent HDF from running its own nominees in the 2020 Proxy Contest or otherwise participating in the 2020 Proxy Contest.

100.    Enzo's intent was confirmed in a conversation between Harbert's and Enzo's respective counsel.  On December 4, 2020, counsel for Harbert advised counsel for Enzo that Harbert had no intention of nominating directors in the 2020 Proxy Contest and requested that

43

Enzo withdraw its Complaint. However, Enzo would agree to withdraw its Complaint only if Harbert would agree to a three-year standstill agreement – which would have prohibited Harbert from nominating directors and required it to support all Company director nominees and proposals put to a shareholder vote during the next three years – a blatant effort to entrench the incumbent Board.

101.    While Harbert did not nominate any candidates for election at the 2020 Annual Meeting, another shareholder, Roumell Asset Management, LLC ("Roumell"), nominated two directors and submitted two proposals for the 2020 Annual Meeting.

102.    The Company also used its Complaint against Harbert as a tool in its proxy campaign against Roumell. In a December 23, 2020 fight deck – notwithstanding the fact that Harbert had not nominated any directors during the 2020 Proxy Season – the Company created a slide devoted to Harbert, falsely stating that "Harbert has not delivered on any of their objectives or promises. They misled the Company and its shareholders." Enzo December 23, 2020 Schedule 14A, attached hereto as Exhibit J at PDF p. 4. The Company then attached the Enzo Complaint to the fight deck, further evidencing that the Enzo Complaint was brought primarily an entrenchment tactic and to further silence Harbert.

103.    Enzo ultimately rejected Roumell's nominations for technical reasons. Accordingly, the Company's three nominees, Rabbani, Tagliaferri and Walters, ran unopposed for election.

**N.  At the 2020 Annual Meeting, Rabbani Fails to Win Majority Support for his Uncontested Seat, Requiring Him to Submit His Resignation to the Board**

104.    At the 2020 Annual Meeting, Tagliaferri and Walters were elected as directors. However, in an extraordinary outpouring of shareholder dissatisfaction, Rabbani was not elected

even though his candidacy was unopposed, as he received more votes against than for his election. *See* Enzo Jan. 8, 2021 Form 8-k, attached hereto Exhibit K. Given this, the Company's By-Laws required Rabbani to conditionally tender his resignation to the Board, which the Board then would have 90 days to accept or reject.

105.    Pursuant to Article I, Section 9 of the By-Laws:

Any incumbent director nominee who fails to receive a majority of the votes cast in an election that is not a contested election shall promptly tender his or her resignation to the Board with such resignation expressly stating that it is contingent upon the acceptance of the resignation by the Board in accordance with this Section 9. The Nominating/Governance Committee of the Board, or such other committee designated by the Board pursuant to these By-Laws, shall recommend to the Board whether to accept or reject the tendered resignation, or whether other action should be taken. The Board shall act on the resignation, taking into account the Nominating/Governance Committee's recommendation, and publicly disclose on a Form 8-K its decision regarding the resignation and, if such resignation is rejected, the rationale behind the decision, within ninety (90) days following certification of the election results. The Nominating/Governance Committee in making its recommendation, and the Board in making its decision, each may consider any factors and other information that they consider appropriate and relevant. The director who has tendered their resignation pursuant to this Section 9 shall not participate in the Nominating/Governance Committee's or the Board's deliberations or decision with respect to the tendered resignation. If the board of directors accepts a director's resignation pursuant to this Section 9, then the Board may fill the resulting vacancy pursuant to these By-Laws and the Certificate of Incorporation.

*See* Amendment No. 1 to Amended and Restated By-Laws of Enzo Biochem, Inc., attached hereto as Exhibit L.

106.    Believing that the will of the shareholders had been clearly expressed and believing that Rabbani's control over the Company must come to a close, HDF wrote a letter to the Board urging the Board to accept Rabbani's resignation and move the Company into a new future.

**O. Ignoring the Will of the Shareholders, the Board Rejects
Rabbani's Resignation**

107.    On March 15, 2021, the Board announced that Rabbani would step down as CEO after a suitable replacement was found and that the executive search firm Korn Ferry would be engaged to find a new CEO.  *See* Enzo March 16, 2021 Form 8-K, attached hereto as Exhibit M. This disclosure made no mention of the fact that the shareholders vote had required Rabbani to submit his resignation in his role as a director, not his role as CEO.

108.    Remarkably, however, days later, the Company announced that the Board's Nominating/Governance Committee, which is composed of Counterclaim Director Defendants Perlysky, Fischer, and Walters, recommended to the Board that it reject Rabbani's resignation from the Board.  The Board then rejected Rabbani's resignation.  *See* Enzo March 19, 2021 Form 8-K, attached hereto as Exhibit N.

109.    The By-Laws require that, in the event the Board rejects a resignation of a director who fails to receive a majority of votes in an uncontested election, the Board must state its "rationale" for the decision.   The *only* rationale the Board offered was "the understanding of Rabbani's perceived value in facilitating the smooth transition of the Company's leadership plans and Rabbani's historical knowledge of the Company's business and industry."  Exhibit N at PDF p. 2.  Such a vague explanation of the rationale for the Board's decision amounts to no-explanation at all and thus violates Article I, Section 9 of the Bylaws.

110.    The Board was roundly criticized for its decision to contravene the will of the Company's shareholders.  John Jonnarone, the Editor-in-Chief of CorpGov.Com, which reports on corporate governance issues, wrote an article entitled *Board Directors Stopping the Steal? Enzo Biochem Flouts Shareholder Democracy*.  In the article, Mr. Jonnarone criticized the Board

for failing to accept Rabbani's resignation, stating that "By all indications, the board intends to ignore the will of shareholders and essentially stage a coup."

111.    The article quotes Charles Elson, Professor of Finance, Edgar S. Woolard, Jr Chair in Corporate Governance at the University of Delaware, who stated that the Board "should accept his resignation."  Professor Elson went on to state "This is regretfully straightforward – the board works for the shareholders and needs to abide by them."

112.    Notwithstanding the fact that the CEO search was announced nearly seven months ago, as of the date of this filing, Rabbani remains both Chairman and CEO of the Company.  Shareholders have received no update about the search for a new CEO other than general statements that it remains ongoing, with no information about process or target completion.  In an earnings call, on the date of this filing, October 12, 2021, the Company stated that shareholders would be updated on the CEO search "at the appropriate time" with no other information provided.  As a result of this announcement, the Company's stock price dropped 6.85%.

## STATEMENT OF CLAIMS

### Count I – Violation of Section 14(a) of the Exchange Act and 17 C.F.R. § 240.14a-9
(Asserted Individually Against Counterclaim Defendant Enzo)

113.    Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 112 above as if fully set forth herein.

114.    In violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, the Company disseminated false and misleading proxy materials and solicitation statements that were false and/or, in light of the circumstances under which they were made,

47

omitted to state material facts necessary to make the statements therein not materially false or misleading.  Enzo is liable for having made those statements.

115.   In the December 5, 2019 Schedule 14A filed by Enzo (attached hereto as Exhibit O), Enzo made the following material false statements:

a) Enzo stated that Peter Clemens "appears to be a home-town friend of Harbert from Alabama."  Ex. O at PDF p. 7.  In fact, Mr. Clemens is from Tennessee, not Alabama, which the Company knew, and Mr. Clemens had no prior association with Harbert.

b) Enzo stated that HDF "Seeks Fire Sale of Company at Depressed Prices." Ex. O at PDF p. 4.  In fact, Harbert never encouraged any sale of the Company for a depressed price and in fact, the only price HDF ever encouraged the Company to sell for represented a 178% premium over the Company's trading price.

c) Enzo stated that HDF had "No Plan" for Enzo.  Ex. O at PDF p. 4.  In fact, in its proxy materials filed with the SEC throughout the 2019 Proxy Season, HDF repeatedly explained what it believed the strategic goals of the Company should be, at the Company was well aware.

116.   In the January 17, 2021 Schedule 14A filed by Enzo (attached hereto as Exhibit P), Enzo made the materially false statement that "Harbert has no experience with investments in Healthcare" in an effort to discredit Harbert. Exhibit P at PDF p. 42.  In fact, as Enzo was well aware, Harbert had invested in multiple companies in the healthcare industry.

117.   In the January 28 Enzo Press Release, Enzo made the following material false statements:

a) Enzo stated the Company "*Delays Annual Meeting Until Feb. 25*." Exhibit A at PDF p. 4 (emphasis in original.)  It further noted that the Company "is taking these actions today" to change the 2019 Annual Meeting and that "the Board will delay the Annual Meeting until February 25, 2020."  Exhibit A at PDF p. 5.  In fact, the Company knew that the 2019 Annual Meeting would convene as planned on January 31, 2020

b) Enzo stated that the "proposed increase in Board size and diversity reflects the feedback and desire of Enzo's shareholders," when, in fact, the

Company's shareholders repeatedly demonstrated a contrary desire. Ex. A at PDF p. 5.

118.    In the January 31 Enzo Proxy, Enzo made the following material misstatements:

a) Enzo stated that the Required Super Majority Vote was "inadvertently added" to the Charter, when it clearly was not. *See supra* 64 to 68.

b) Enzo stated that the "By-Law Amendment to expand the board will be approved if it receives the affirmative vote of a majority of the votes present in person or by proxy by the holders of shares entitled to vote therein." Exhibit C at PDF p. 13. In fact, the Company knew that not to be true.

119.    Each of the statements described in Paragraphs 115 to 118 was independently false and/or misleading, as well as misleading in the context of the proxy solicitations in which it was made and Enzo's other representations to its shareholders.

120.    Enzo knew the statements described in Paragraphs 115 to 118 were false and/or misleading at the time it made them.

121.    Enzo was at least negligent in making these false and/or misleading statements described in Paragraphs 115 to 118 in its proxy solicitations.

122.    The false and misleading statements described in Paragraphs 115 to 118 were material in that a reasonable stockholder would have considered them important in deciding whether to attend the 2019 Annual Meeting and how to vote in the shareholder election. In addition, a reasonable shareholder would have viewed a full and accurate disclosure as significantly altering the total mix of information made available in the statements described in Paragraphs 115 to 118 and in other information reasonably available to stockholders.

123.    By reason of the foregoing, Enzo violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

124.    Because this cause of action arises from the same transaction or occurrence as the Section 14(a) claim asserted by Enzo against Harbert in the Complaint, it is a compulsory counterclaim, and, thus, the running of the statute of limitations is tolled for this claim as of the filing of the Enzo Complaint.

125.    Because of the false and misleading statements described in Paragraphs 115 to 118, Plaintiffs have been damaged monetarily based on the expenses incurred in responding to them and other expenses associated with the 2019 Proxy Season.

### Count II – Violation of Section 20(a) of the Exchange Act
(Asserted Individually Against Rabbani, Weiner, Hanna, Perlysky, and Fischer for Violations of Section 20(a) of the Exchange Act)

126.    Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 125 as if fully set forth herein.

127.    Rabbani, Weiner, Hanna, Perlysky, and Fischer[5] (the "2019 Board Defendants") acted as controlling persons of Enzo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Enzo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained described in Paragraphs 115 to 118, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that are materially false and misleading.

128.    On information and belief, each of the 2019 Board Defendants was provided with, or had unlimited access to, copies of the statements described in Paragraphs 115 to 118 prior to

---

[5] Fischer was not yet a member of the Board at the time of the statements described in Paragraph 115 were made. Accordingly Section 20(a) liability is not asserted against Fischer as to those statements.

50

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129.    In particular, the statements described in Paragraphs 115 to 118 are statements of the Board's positions made in the midst of a proxy contest with a dissident shareholder.  Under those circumstances, there can be no doubt that the 2019 Board Defendants were involved in the drafting and formulation of the statements at issue as, in the case of Weiner, Fischer, and Hanna, the statements were made in connection with their direct election, and, for all the 2019 Board Defendants, the statements were made in connection with the proxy contest relating to the 2019 Annual Meeting that would determine the composition of the Board itself.

130.    Each of the 2019 Board Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

131.    By virtue of the foregoing, the 2019 Board Defendants have violated Section 20(a) of the Exchange Act.

132.    As set forth above, the 2019 Board Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions, as alleged herein.  By virtue of their positions as controlling persons, these 2019 Board Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the 2019 Board Defendants' conduct, HDF has been damaged.

51

**Count III – Breach of Fiduciary Duties – Entrenchment During 2019 Proxy Season**
(Asserted Individually by Counterclaim Plaintiffs Against Rabbani, Weiner, Hanna, Perlysky, and Fischer)

133.    Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 132 above as if fully set forth herein.

134.    The 2019 Board Defendants owed Enzo's shareholders fiduciary duties of care, good faith, loyalty, candor, and independence.

135.    The 2019 Board Defendants repeatedly abused their positions and misused the corporate machinery to impede the exercise of the stockholder franchise.

136.    By acting for the primary purpose of entrenchment, the 2019 Board Defendants breached those fiduciary duties.

137.    As set forth above, among other things, the 2019 Board Defendants delayed the 2019 Annual Meeting; falsely stated that the 2019 Annual Meeting would not be convened on January 31, 2020 to enable themselves to have an opportunity to expand the Board; sought to expand the number of Board seats; and sought to avoid the necessary Required Supermajority Vote threshold to expand the Board, all for the purpose of preserving their own or their fellow directors' places on the Board and diminishing the influence of the Harbert Nominees without any proper justification, other than entrenchment, much less a compelling one.

138.    As a direct and proximate result of the 2019 Board Defendants' breach of their fiduciary duties, HDF has been damaged monetarily by the expenses associated with the 2019 Proxy Season.

**Count IV – Breach of Fiduciary Duties –Undermining the Ability of the HDF Nominees to Function as Board Members**

(Asserted Individually by Counterclaim Plaintiffs Against Rabbani, Weiner, Perlysky, and Fischer)

139. Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 138 above as if set forth fully herein.

140. Rabbani, Weiner, Perlysky, and Fischer owed Enzo's stockholders fiduciary duties of care, good faith, loyalty, candor, and independence.

141. Rabbani, Weiner, Perlysky, and Fischer repeatedly abused their positions and misused the corporate machinery to impede the exercise of the stockholder franchise.

142. By acting for the primary purpose of entrenchment, Rabbani, Weiner, Perlysky, and Fischer breached those fiduciary duties.

143. Rabbani, Weiner, Perlysky, and Fischer refused to cooperate with the HDF Nominees, refused to provide the HDF Nominees with critical information that would have permitted them to do their duties as Board members, acted with overt hostility to HDF, and created an environment where the HDF Nominees could no longer serve as Board members. By causing their resignation, those Counterclaim Defendants acted for the purpose of cementing their control of the Board and eliminating dissent. In doing so, they breached their fiduciary duties by undermining the shareholder franchise and the nominations made by HDF, at great expense.

144. As a direct and proximate result of Rabbani, Weiner, Perlysky, and Fischer's breach of their fiduciary duties, HDF has been damaged as they have negated HDF's participation in the shareholder franchise and denied HDF the benefit of the expenses it incurred in connection with nominating and electing the HDF Nominees.

53

**Count V – Breach of Fiduciary Duties – Entrenchment During 2020 Election**
(Asserted Individually by Counterclaim Plaintiffs Against Rabbani, Perlysky, Fischer, Tagliaferri, and Walters)

145.    Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 144 above as if set forth fully herein.

146.    Rabbani, Perlysky, Fischer, Tagliaferri, and Walters (the "2020 Board Defendants") owed Enzo's stockholders fiduciary duties of care, good faith, loyalty, candor, and independence.

147.    The 2020 Board Defendants repeatedly abused their positions and misused the corporate machinery to impede the exercise of the stockholder franchise.

148.    By acting for the primary purpose of entrenchment, the 2020 Board Defendants breached those fiduciary duties.  Among other things, the 2020 Board Defendants authorized the Company to sue Harbert for the purpose of preventing HDF from participating in the 2020 Proxy Season and sought from Harbert a standstill agreement that would prevent Harbert from participating in the shareholder franchise for a three-year period for no proper purpose.

149.    As a direct and proximate result of the 2020 Board Defendants breach of its fiduciary duties, HDF has been damaged, including by the expenses associated with this lawsuit.

**Count VI – Breach of Fiduciary Duties – Rejection of Rabbani's Resignation**
(Asserted Individually by Counterclaim Plaintiffs Against Perlysky, Fischer, Tagliaferri, and Walters)

150.    Counterclaim Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 149 above as if set forth fully herein.

151.    Perlysky, Fischer, Tagliaferri, and Walters owed Enzo's stockholders fiduciary duties of care, good faith, loyalty, candor, and independence.

152.   After the shareholders voted overwhelmingly against Rabbani at the 2020 Annual Meeting, Rabbani was required to tender his resignation to the other members of Board, which consisted of Perlysky, Fischer, Tagliaferri, and Walters.   Perlysky, Fischer, Tagliaferri, and Walters refused to accept the will of the shareholders, rejected the resignation and failed to adequately disclose, as required by the Company's By-Laws, the Board's rationale for not accepting the resignation.   Instead, the Board announced that Rabbani would step down as CEO when a suitable replacement was found.   Over six months later, Rabbani remains CEO.   In doing so, the defendants have sought to entrench their control of the Board and have acted in their own self-interests, rather than in the interests of the Company and its shareholders.

153.   As a direct and proximate result of Perlysky's, Fischer's, Tagliaferri's, and Walters's breach of their fiduciary duties, HDF has been damaged, as HDF voted against Rabbani at the 2020 Annual Meeting and the actions of Perlysky, Fischer, Tagliaferri, and Walters deny HDF its ability to participate in the shareholder franchise.

### PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim Plaintiffs respectfully request the following judgment in favor of Counterclaim Plaintiffs and against Counterclaim Defendants as follows:

A.   A determination that the Company violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the 2019 Board Defendants violated Section 20(a) of the Exchange Act;

B.   A determination that the Counterclaim Director Defendants have breached their fiduciary duties;

C.   A mandatory injunction requiring the Board to accept Rabbani's resignation;

55

D.      Damages sustained by Counterclaim Plaintiffs as a result of Counterclaim Defendants' actions, including, without limitation, all attorneys' fees and costs associated with the 2019 proxy contest, as had the Company not falsely stated that the 2019 Annual Meeting would not be convened as planned on January 31, 2020, HDF would have attended the 2019 Annual Meeting and elected its nominees without any further cost and by marginalizing and forcing the resignation of the HDF Nominees, thereby defeating the purpose of the costs that HDF incurred in connection with their nominations;

E.      All attorney's fees and costs associated with defending this action; and

F.      Such other and further relief as the Court may deem necessary and proper.

56

**JURY DEMAND**:  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Counterclaim Plaintiffs demand a jury trial on all claims and issues asserted in the Counterclaims.

Dated: New York, New York
      October 12, 2021

            SCHULTE ROTH & ZABEL LLP

            By:   /s/ Michael E. Swartz
                  Michael E. Swartz
                  Randall T. Adams
                  919 Third Avenue
                  New York, New York 10022
                  (212) 756-2000 (telephone)
                  (212) 593-5955 (facsimile)
                  Michael.Swartz@srz.com

                  *Attorneys for Counterclaim Plaintiffs*
                  *Harbert Discovery Fund, LP and Harbert*
                  *Discovery Co-Investment Fund I, LP*